**Ranae KIMBLE, Cynthia Baxter, Henry Beamon, Frederick L. Brown, Alto Byrd, Lennon J. Carr, Betty Green, June Harris, Qurrise Harris, Joseph Jones, Eddie L. Palmore, Pauline Walker and David M. Yellen, Plaintiffs,**

v.

**COUNTY OF NIAGARA, Niagara County Legislature and Niagara County Board of Elections, Defendants.**

**No. 93–CV–471S.**

United States District Court, W.D. New York.

June 30, 1993.

Dennis E. Ward, Ward, Brenon & Divita, Williamsville, NY, for plaintiffs.

Edwin Shoemaker, Lockport, NY, for defendants.

## CONSENT DECREE

SKRETNY, District Judge.

### *INTRODUCTION*

This action was commenced on May 28, 1993 by the filing of a complaint and a motion for a preliminary injunction. Plaintiffs' complaint alleged eleven causes of action under 42 U.S.C. §§ 1973, 1983 and 1988, as well as supplemental claims under the New York State Constitution and Section 10 of the New York State Municipal Home Rule Law ("MHRL"). Plaintiffs demanded a declaratory judgment that the existing districting plan for elections to the Niagara County Legislature, which was enacted in 1983 with the use of 1980 census figures, violated the Equal Protection Clause of the Fourteenth Amendment; the Fifteenth Amendment; Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973(b); Article I, sections 1 and 2 of the New York State Constitution; and MHRL § 10(1)(ii)(a)(13)(a)(i), (ii). Plaintiffs also sought a permanent injunction against all defendants preventing them from enforcing the existing plan, continuing representation under its district lines, receiving petitions for candidates, and conducting primary and general elections under such existing district lines until such time as this Court implemented a new districting plan. Plaintiffs further demanded that this Court draft and

implement a districting plan of reapportionment for the 1993 elections and thereafter, using 1990 census data, which met all constitutional and statutory requirements. Finally, plaintiffs demanded reasonable attorney fees, pursuant to 42 U.S.C. § 1973c and 1988, together with the costs and disbursements of this action.

Plaintiffs' complaint arises from the facts that the current districting plan for elections to the Niagara County Legislature was enacted by the Legislature in 1983 with the use of 1980 census data, and that the concentrated African–American population in the County was divided into four separate legislative districts under that plan. Plaintiffs alleged that, due to demographic changes reflected by the 1990 census figures, the nineteen legislative districts have substantially unequal populations [1], and therefore violate the one-person one-vote requirement of the Equal Protection Clause. Moreover, plaintiffs alleged that the dilution of African–American voting strength made it virtually impossible for African–American residents of Niagara County to elect representatives of their choice to the Niagara County Legislature, in violation of the Equal Protection Clause and the Voting Rights Act. Finally, plaintiffs contended that the existing plan failed to comport with MHRL § 10 because of population deviations, and because it improperly divided the Town of Wheatfield into two separate legislative districts.

### HISTORY OF THE CASE

This lawsuit was precipitated by the failure of the Niagara County Legislature to implement a valid districting plan after the 1990 census.[2] Niagara County was last reapportioned in 1983 with the use of 1980 census data. Also enacted at that time was a voter-approved referendum that reduced the number of legislative districts from thirty-one to

nineteen. The plan was effective for the first time for the 1985 legislative elections.

In 1991, the legislature attempted to redistrict the county with the use of 1990 census data. Nonetheless, the 1991 plan was invalidated as the result of a lawsuit in New York State Supreme Court, because the plan was not adopted according to MHRL § 20(4), requiring that no local law be passed unless it is in final form and upon the desks of the legislators at least seven calendar days, exclusive of Sunday, prior to passage. In its opinion, the court also commented that Wheatfield was improperly divided into separate districts. Finally, the court noted,

> [T]his court is troubled by the computer expert's alleged inability to assist the minorities. We have an opportunity to give the Black community in the City of Niagara Falls a voice in county government. Their population is 9,634 persons—not an insignificant number when compared with the minimum requirement of 11,039 for a district. A greater effort should be made to give this segment of the population a place in county government.

*Tylec v. Niagara County Legislature* (Opinion of Justice Jacqueline Koshian, June 6, 1991, pp. 6–7), *aff'd*, 175 A.D.2d 676, 572 N.Y.S.2d 600 (4th Dept.1991).

The Legislature undertook no further efforts to devise a valid districting plan until early 1993, when a plan was placed on the legislative agenda for April 20, 1993. However, the agenda item was subsequently withdrawn, due to political disagreements. No subsequent efforts were made, because pursuant to MHRL § 10(1)(ii)(a)(113)(e) a plan could not be properly enacted by the Legislature in time for the 1993 county elections. The first day for the circulation of designating petitions was June 8, 1993. Thus, the 1993 elections were scheduled to proceed ac-

---

1. Under the 1983 plan, an ideal district would be comprised of 11,619 residents. However, the district with the highest population (seventeenth district) is comprised of 16,575 residents, whereas the district with the lowest population (sixth district) is comprised of 8,676 residents. This results in a deviation of 68%.

2. Section 10(1)(ii)(a)(13)(f) of the MHRL provides:

> Notwithstanding any inconsistent provisions of any general or special law, or any local law, ordinance, resolution or city or county charter heretofore or hereafter adopted, no local government may restructure its local legislative body (pursuant to provision of this chapter or any other provision of law) more than once in each decade commencing with the year nineteen hundred seventy....

cording to the 1983 plan. Because the legislative process had broken down, plaintiffs turned to the judicial process for relief.

Counsel for the parties initially appeared before this Court on June 2, 1993 for an expedited status conference. Because there were only four business days remaining before designating petitions would be distributed and circulated, this Court believed that the most productive first step in this litigation would be for counsel to meet to evaluate their differences. Counsel were directed to meet on June 3, 1993 to discuss: (1) whether any factual issues truly existed; and (2) if not, whether counsel could agree on a reapportionment plan for the 1993 election that met all constitutional and statutory requirements. Plaintiffs had already drafted a proposed plan that could be used as a starting point in those discussions.

On the afternoon of June 3, 1993, this Court conferenced with counsel, who reported that they had tentatively agreed that plaintiffs' proposed plan met all legal requirements. The proposed plan created new election districts with population deviations well within the one-person one-vote requirements, satisfied the Voting Rights Act through the creation of a 57.1% African–American majority-minority district within the City of Niagara Falls, did not improperly divide the Town of Wheatfield, and met other public policy objectives set forth in MHRL § 10.

This Court reviewed the proposed plan, and made a preliminary determination that it did indeed comply with the relevant constitutional and statutory requirements. Nonetheless, this Court requested that counsel attempt to adjust the boundaries of the proposed majority-minority district to increase moderately the ratio of minority population in order to account for residents who are below voting age, and to address the possible effects of low voter turnout and low voter registration. Counsel met with Richard A. Seekins, the Niagara County Director of Planning, Development, and Environmental Services. Mr. Seekins has extensive training and experience in demographics and computer applications to the fields of demographics and economics. Census blocks were examined on an individual basis, and it was determined that through minor adjustments, the minority population could be increased to 57.56%. Counsel also determined that any further expansion of the proposed majority-minority district would only dilute the minority population, and that there was no additional concentration of minorities in Niagara County that would justify the creation of an additional majority-minority district.

During a series of additional conferences, counsel were directed to consider the impact that the proposed reapportionment plan would have on the petitions process and on other political races in Niagara County. Furthermore, counsel for the defendants was instructed to request whatever authority he needed from his clients to enter into a stipulation of discontinuance settling the action according to the terms of the proposed plan. On June 9, 1993 the Niagara County Legislature met in a special session and authorized the county attorney, by a vote of 18–1, to settle this action by stipulating to the proposed reapportionment plan. Counsel also consulted with the commissioners of the Niagara County Board of Elections, the New York State Board of Elections, and the New York State Attorney General's office, to determine the impact that the plan would have on the petitions process.

During the various conferences with this Court, defendants admitted that the existing 1983 plan violated the pertinent constitutional and statutory requirements because it did not provide one-person one-vote, and because it has not enabled African–American residents of Niagara County to elect representatives of their choice to the Niagara County Legislature.

Although this Court was in daily contact with counsel, it determined that public comment on the proposed plan was appropriate, and should be considered by this Court before any plan was finally implemented. By Order of this Court, public notice of the proposed plan was published in four newspapers of general circulation within Niagara County, together with a map indicating the

boundaries of the proposed districts.[3] The public were requested to submit their comments to this Court.

During a conference on June 15, 1993, counsel were directed to prepare a stipulation of discontinuance settling this action. The stipulation was to include a statement of the relevant history of the redistricting problem in Niagara County. The stipulation was also to contain defendants' formal admissions that the existing 1983 plan violated constitutional and statutory law, and that plaintiffs had established at least a *prima facie* case for the plan's invalidity. The stipulation was to set forth the evidentiary data in support of plaintiffs' case and for the validity of the proposed reapportionment plan, including the parties' evidence that population deviation among the proposed districts was as low as practicable, that any further expansion of the proposed majority-minority district would result in a dilution of minority voting strength, and that no additional concentration of African–American population exists in Niagara County that would warrant the creation of a second majority-minority district. Finally, counsel were directed to include a stipulation regarding the impact of the proposed plan on the petitions process.

On June 24, 1993, counsel submitted an executed "Stipulation Discontinuing Action and Consenting to Entry of Decree" ("Stipulation"). The Stipulation fully complies with this Court's directions and includes all the information and evidentiary support necessary to resolve this action in accordance with all relevant constitutional and statutory requirements. First, the Stipulation reiterates plaintiffs' allegations and defendants' admissions, which had previously been made on the record in open court, that the existing plan:

1. violates MHRL § 10(1)(ii)(a)(13)(a)(ii), in that the Town of Wheatfield is unlawfully divided;
2. violates the one-person one-vote principle;
3. essentially prevents the African–American community from electing an African–American resident of that communi-

ty to a position on the county legislature; and
4. violates the Voting Rights Act of 1965 as it relates to the creation of majority-minority districts and the denial to the plaintiffs of the opportunity to elect a candidate of their choice from their community; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by the dilution of minority voting strength; and the Fifteenth Amendment to the United States Constitution as it abridges the rights of the plaintiffs to vote or effectively participate in voting on account of race or color.

These allegations and admissions are supported in the Stipulation by a number of exhibits. The Stipulation establishes the facts that the legislative districts, as presently constituted, contain significant population disparities, and therefore violate the principle of one-person one-vote. Furthermore, the Stipulation exhibits show that minority voting strength has been diluted by the division of the African–American community into separate legislative districts, and that African–Americans have not been able to elect representatives of their choice (Exhibits H and I). Finally, the exhibits show that the Town of Wheatfield has been improperly divided into separate legislative districts, in violation of MHRL § 10(1)(ii)(a)(13)(a)(ii).

Moreover, the Stipulation and exhibits thereto substantiate the legal validity of the proposed plan with respect to the Equal Protection Clause of the Fourteenth Amendment, the Voting Rights Act, the New York State Constitution, and MHRL § 10. The proposed plan corrects the existing violation of § 10 by creating a single election district in Wheatfield (see Exhibit F). The proposed plan creates nineteen election districts with substantially equal populations, thereby satisfying the one-person one-vote requirements of the Equal Protection Clause, the New York State Constitution and MHRL § 10 (see Exhibit A). Counsel have stipulated that the deviations in district populations are

---

**3.** These newspapers were *The Buffalo News, Niagara Gazette, Union Sun & Journal,* and *Tonawanda News.*

the lowest practicable, considering the important public policy considerations contained in § 10 (see Seekins Affidavit, ¶¶ 16–21).

The proposed plan creates a majority-minority district comprised 57.56% of African-American residents. This percentage has been maximized to the extent possible (Seekins Affidavit, ¶¶ 12–15). The parties have stipulated that the new majority-minority district maximizes the opportunity of African-American residents of Niagara County to elect representatives of their choice, and would thereby bring the County into compliance with the Voting Rights Act, the Equal Protection Clause, and the New York State Constitution.

The parties have requested that this Court enter a decree establishing the proposed plan as the permanent reapportionment plan for the remainder of the decade. Counsel have submitted authority indicating that this would be a proper exercise of this Court's jurisdiction and equitable powers.

### *DISCUSSION*

This Court has thoroughly reviewed the proposed plan and the parties' Stipulation, and has determined that the proposed plan meets all relevant constitutional and statutory requirements, including the one-person one-vote standard of the Equal Protection Clause, the Fifteenth Amendment, the Voting Rights Act, and MHRL § 10. Therefore, this Court will exercise its jurisdiction to approve the plan and establish means for its implementation. As the Supreme Court noted in *United States v. Paradise,* 480 U.S. 149, 183–84, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987), a district judge possesses considerable discretion in fashioning a remedy to cure a violation of the Fourteenth Amendment.

A district court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1969). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is

broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Bd. of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971).

*Id.*

This discussion will now turn to assess the validity of and justifications for the proposed plan under the relevant principles of law.

### *One–Person One–Vote*

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States...." U.S. Const., Amend. XIV, section 1. One such privilege is the right to vote. In *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court held that failure to reapportion periodically may violate the Equal Protection Clause. Furthermore, the Court has explained that election districts must contain equal populations in order to comply with the one-person one-vote requirement of the Equal Protection Clause. *See Gray v. Sanders,* 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963). This requirement prevents states or local governments "from diluting an individual's rights to vote and to receive equal representation which can occur when one is placed in a heavily populated legislative district relative to other ... districts." *Fund for Accurate & Informed Representation v. Weprin,* 796 F.Supp. 662, 668 (N.D.N.Y.), *aff'd,* —— U.S. ——, 113 S.Ct. 650, 121 L.Ed.2d 577 (1992). These governments are required to "make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable." *Id.* (quoting *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, *reh'g denied,* 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964)).

■ Although the population of election districts must be as close to equal as possible, important public policy concerns may justify slight deviations. *See Chapman v. Meier,* 420 U.S. 1, 24, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975). Generally, legislatively enacted districting plans that result in deviations of less than 10% are presumed to be constitutional. *See Brown v. Thomson,* 462

U.S. 835, 842, 103 S.Ct. 2690, 2695, 77 L.Ed.2d 214 (1983).

■ The proposed plan in this case substantially complies with the one-person one-vote requirement of the Equal Protection Clause. The plan creates nineteen election districts with an approximate deviation of 7.9%. The district with the highest population (twelfth district) is comprised of 12,052 residents, and the district with the lowest population (eighth district) is comprised of 11,171 residents (Exhibit A). Although this Court examined the feasibility of creating districts with a lower population deviation, it concluded that such was not practicable, and that the 7.9% deviation falls well within the standard for legislatively enacted plans. And although the proposed plan has been embraced by defendants by way of settlement of this lawsuit rather than through the ordinary legislative process, it is nevertheless appropriate to use the 10% standard. *See Tallahassee Branch of NAACP v. Leon County, Florida,* 827 F.2d 1436, 1438–40 (11th Cir.1987), *cert. denied,* 488 U.S. 960, 109 S.Ct. 402, 102 L.Ed.2d 391 (1988) (although defendant admitted liability under Voting Rights Act and enacted a remedial plan without a referendum, as required by state law, plan was nonetheless entitled to deference as a "legislatively enacted plan").

In addition, the proposed plan meets the important public policy objectives enunciated in MHRL § 10. For instance, the plan eliminates the division of the Town of Wheatfield into separate election districts (see Exhibit F), and thereby comports with § 10(1)(ii)(a)(13)(a)(ii), which prohibits such a division of a town unless the town has more than 110% of a full ratio for each representative. In fact, any minor variations in population among the proposed districts are justified by the public policy concerns enunciated in § 10, including the desire for convenient, contiguous, and compact districts. *See Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).

For these reasons, there is no constitutional or statutory impediment to the issuance of a consent decree establishing and implementing the proposed reapportionment plan.

*Minority Voting Strength*

■ The Equal Protection Clause also guarantees that an individual's right to vote may not be infringed on the basis of race. Where a districting plan diminishes the voting strength of a racial minority, it must be struck down. *Reynolds,* 377 U.S. at 566, 84 S.Ct. at 1384.

■ Likewise, the Fifteenth Amendment provides, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude." U.S. Const., Amend. XV, section 1. Hence, voting rights cannot be denied on the basis of race. "When an identifiable racial or ethnic group is singled out for discriminatory treatment which interferes with the right to vote, the fifteenth amendment is violated." *Puerto Rican Legal Defense and Education Fund v. Gantt,* 796 F.Supp. 681, 687 (citing *Gomillion v. Lightfoot,* 364 U.S. 339, 340, 346, 81 S.Ct. 125, 126, 129, 5 L.Ed.2d 110 (1960)).

To eliminate interference with voting rights on the basis of race, Congress passed the Voting Rights Act of 1965, which was subsequently amended in 1970, 1975 and 1982. 42 U.S.C. § 1973, *et seq.* Section 2 of the Voting Rights Act prohibits any districting plan that "results in a denial or abridgement of voting rights on the basis of race, color, or language." 42 U.S.C. § 1973(a). A violation of the Act is established by proof that "based on the totality of the circumstances," members of a racial minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). Once a violation of the act has been admitted or proved, a remedial districting plan should restore these opportunities to minority voters. This may be accomplished through the creation of a majority-minority voting district that maximizes the opportunity of members of the affected group to elect representatives of their choice to government office. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Garza v. County of Los Angeles,* 918 F.2d 763, 776 (9th Cir.1990), *cert. denied,* 498 U.S. 1028,

111 S.Ct. 681, 112 L.Ed.2d 673 (1991). For a full discussion of the constitutional and statutory guarantees of minority voting rights, *see Gantt,* 796 F.Supp. at 687–92.[4]

■ The proposed plan creates a majority-minority district (second district) comprised of a 57.56% African–American population. Counsel have designed this district to comply with a request of this Court to maximize the ratio of minority population to account for residents below voting age, low voter registration, and low voter turnout. The boundaries of the proposed majority-minority district have been drawn pursuant to an examination of individual census blocks to maximize minority representation. Any further expansion of these boundaries would only dilute minority voting strength in the district (see Seekins Affidavit, ¶ 14–15; Exhibit G). Furthermore, there is no additional concentration of African–Americans or other minorities in Niagara County that would justify the creation of an additional majority-minority district (Seekins Affidavit, ¶ 13). Therefore, the proposed plan corrects the discriminatory effects of the 1983 plan, which divided the African–American population into four separate voting districts, and maximizes to the extent practicable the opportunity of African–Americans in Niagara County to elect representatives of their choice. The plan thereby comports with the Voting Rights Act. There is no question of whether the proposed plan violates the Fourteenth or Fifteenth Amendments because those amendments prohibit only discriminatory plans that were implemented with a discriminatory purpose. *See Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

For these reasons, there is no constitutional or statutory impediment to the issuance of a consent decree establishing and implementing the proposed reapportionment plan.

### The Petitions Process

At the direction of this Court, counsel for the parties consulted with the Niagara County and New York State Boards of Elections,
as well as the New York State Attorney General's Office, to determine the implications of the proposed reapportionment plan vis à vis the procedures that are used for the circulation of designating petitions and collection of signatures necessary for nomination. Candidates for the Niagara County Legislature have been collecting signatures since June 8, 1993, when the petitions were distributed.

Through their consultations with the offices listed above, counsel determined that minimal disruption of the petitions process would result if the number of signatures necessary to place a candidate's name on the ballot were reduced, and the 1983 district lines were used solely for the purpose of collecting such signatures.

Based on previous election data, the Niagara County Board of Elections determined that 50 signatures should be required for candidates of the Republican and Democratic parties, 75 for independent candidates, and 3 for candidates of the Conservative, Liberal, and Right-to-Life parties. At the direction of this Court, the parties have included an executed Stipulation regarding these modifications, and the justifications therefor have been included in the parties' Stipulation of Discontinuance. After reviewing the Stipulation and the authorities cited by counsel, this Court has concluded that the Stipulation represents a fair and expeditious method of selecting candidates for the County Legislature. Therefore, the petitions process will be modified to the extent set forth therein, but only for the 1993 legislative election. After such election, the petitions process will revert to the procedures typically employed by the Board of Elections.

### Duration of the Proposed Plan

■ All parties request that this Court, by its consent decree, establish the proposed plan as the plan for the remainder of the decade, pursuant to MHRL § 10. Furthermore, the Resolution of the Niagara County Legislature authorizing the Niagara County

---

4. On June 28, 1993 the Supreme Court entered a decision in *Shaw v. Reno,* — U.S. —, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). In that case, the Court held that nonminority voters may have a valid cause of action under the Equal
Protection Clause when a state draws districting lines on the basis of race without sufficient justification. This Court has reviewed the *Shaw* decision, and has concluded that it does not preclude the issuance of this Decree.

Attorney to enter into the Stipulation of Discontinuance contemplates that the stipulated plan shall constitute the plan for the balance of the decade.

Because the proposed plan comports with all constitutional and statutory requirements, and because it is within this Court's remedial powers to establish a reapportionment plan for the remainder of the decade, the districting plan that is established by this Consent Decree shall be the reapportionment plan for elections to the Niagara County Legislature until the results of the year 2000 decennial census are available to the Niagara County Legislature, and the Legislature has the opportunity to redistrict according to the normal legislative process. *See Connor v. Coleman*, 425 U.S. 675, 96 S.Ct. 1814, 48 L.Ed.2d 295 (1976); *Garza*, 918 F.2d 763 (permanent plans implemented by court where legislative bodies failed to reapportion timely). For illustrative purposes, a map reflecting generally the new district boundaries under the proposed plan, with the total population of each new district, is attached to this Consent Decree as "Appendix B."

### *CONCLUSION*

Although this case was precipitated by the failure of a legislative body to fulfill its constitutional and statutory duties, this case serves as a model for future litigation in the area of voting rights. The willingness of the defendants to admit their failure and to commit themselves to the negotiation of a valid redistricting plan served the best interests of the residents of Niagara County, and contributed to a swift resolution of this lawsuit. The willingness of the plaintiffs to look beyond their individual interests, and to propose solutions that would minimize inconvenience to all concerned contributed to the development of a comprehensive and equitable solution. The willingness of counsel to cooperate and anticipate potential problems was essential to this process. Also important were the efforts of Mr. Richard Seekins, the Niagara County Director of Planning, Development, and Environmental Services.

However, there was also a need for close judicial supervision of this case. This Court made certain that counsel adhered precisely to all relevant constitutional and statutory requirements during their negotiations and in drafting their Stipulations. This Court required that the stipulated plan achieved substantial equality of population among the districts, and maximized the opportunity of racial minorities to elect representatives of their choice. This Court also directed counsel to investigate and research a number of legal and practical considerations. To the extent practicable, this Court required and received from counsel detailed evidentiary and explanatory exhibits relating to both the existing and proposed plans, which are incorporated into and made a part of the parties' Stipulation so as to establish and make available a clear and precise record for its entry, and for the related Order implementing the proposed plan.

Moreover, this Court required counsel to provide notice of the proposed plan in four newspapers of general circulation in Niagara County, together with a map indicating the new district boundaries. Public comment to this Court was solicited from Niagara County residents. Few letters were received by this Court, and although this Court considered those letters very carefully, nothing in those letters precludes the implementation of the proposed plan. The letters have been made a part of the record in this case.

In conclusion, the stipulated reapportionment plan comports with all constitutional and statutory requirements, and represents an equitable resolution of this lawsuit. Therefore, the stipulated reapportionment plan is hereby implemented as the plan for the remainder of the decade. For illustrative purposes, a map reflecting generally the new district boundaries under the proposed plan, with the total population of each new district, is attached to this Consent Decree as "Appendix B."

### *ORDER*

IT HEREBY IS ORDERED, that the reapportionment plan proposed by the parties in settlement of this action is APPROVED, according to the terms set forth in the executed Stipulation of Discontinuance, which is incorporated into this Consent Decree and is

attached as "Appendix A" (*not reproduced in published version* ).

FURTHER, that the plan shall constitute the plan for the balance of the decade, in accordance with New York State Municipal Home Rule Law § 10(1)(ii)(a)(13)(f).

FURTHER, that the plan shall last until the Niagara County Legislature has the opportunity to enact a redistricting plan with the use of year 2000 census data.

FURTHER, that defendants shall immediately take whatever steps are necessary to implement the plan in time for the 1993 legislative election.

FURTHER, that defendants shall complete the delineation of the precise geographic boundaries of the new districts, and shall file and serve a copy thereof, no later than Thursday, July 15, 1993.

FURTHER, that defendants shall publish notice of the details of the new plan, together with a clear map indicating the precise geographic boundaries of the new districts, on or before Saturday, July 17, 1993 in *The Buffalo News, Niagara Gazette, Union Sun & Journal,* and *Tonawanda News.*

FURTHER, that solely for the purposes of the 1993 election to the Niagara County Legislature, 50 signatures shall be required for designating petitions for candidates of the Democratic and Republican parties; 75 signatures for independent candidates; and 3 signatures for candidates of the Conservative, Liberal and Right-to-Life parties.

FURTHER, that solely for the purposes of the 1993 election to the Niagara County Legislature, the legislative districts existing under the 1983 plan shall be used for the collection of such signatures.

FURTHER, that all other nominations and designations shall be controlled by Article 6 of the New York State Election Law.

FURTHER, that in accordance with paragraph 32 of the Stipulation of Discontinuance, counsel for plaintiffs shall file and serve a motion for attorney fees and costs, with legal and factual support therefor, in accordance with the schedule to be issued under separate cover.

FURTHER, that counsel for the parties shall appear before this Court on Monday, July 26, 1993 at 9:00 a.m. in Part IV, Mahoney State Office Building, 65 Court Street, Buffalo, New York for a status conference on the implementation of the new plan.

SO ORDERED.

674

## APPENDIX B

NEW LEGISLATIVE DISTRICTS, WITH TOTAL POPULATION PER DISTRICT