**Russel H. BEATIE, Jr., Plaintiff–Appellant,**

v.

**CITY OF NEW YORK; Rudolph Giuliani, Mayor, Mayor of the City of New York; Council of the City of New York, Defendants–Appellees.**

No. 1151, Docket 96–9131.

United States Court of Appeals,
Second Circuit.

Argued March 13, 1997.

Decided Sept. 2, 1997.

Russel H. Beatie, Jr., New York City (Craig M. Deitelzweig, New York City, of counsel), for Plaintiff–Appellant.

Cheryl Payer, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, Stephen J. McGrath, Richard M. Weinberg, Deborah Rand, New York City, of counsel), for Defendants–Appellees.

Before: CARDAMONE, JACOBS and CABRANES, Circuit Judges.

CARDAMONE, Circuit Judge:

Today, cigar makers cannot keep up with the demand for their product. William G. Flanagan, *Cigar Madness,* Forbes, April 21, 1997, at 134. Reasons advanced for this new-found popularity range from the attraction the politically incorrect cigar holds for those who dislike to run with the herd, to the role of the cigar as a status symbol, as telling as a cellular telephone. *See JR Tobacco of America, Inc. v. Davidoff of Geneva,* 957 F.Supp. 426, 428 (S.D.N.Y.1997). In the midst of this cigar-smoking renaissance, and after considerable public debate, the City of New York enacted its Smoke–Free Air Act (Act), one of the nation's toughest anti-smoking laws.

Plaintiff Russel H. Beatie, Jr. comes into this conflict like a modern-day Don Quixote, tilting at the windmills of the law. Unhappy with the Act's restrictions on his ability to enjoy a cigar with his meal whenever and wherever he pleased, plaintiff, an attorney and self-described cigar aficionado, brought this action in the United States District Court for the Southern District of New York (Cote, J.), seeking a judgment declaring the ordinance unconstitutional as applied to cigars.

The essence of Beatie's argument is that although numerous studies show that exposure to secondary *cigarette* smoke can be harmful to nonsmokers, no reliable scientific study has directly shown secondary *cigar* smoke to have comparably adverse effects. Absent such evidence, Beatie contends, the City's prohibitions against cigar smoking bear no rational relationship to a legitimate government interest, and they therefore violate his substantive due process rights.

BACKGROUND

Tobacco use has long been identified as a cause of death and disease in smokers, and in recent years medical researchers and public health officials have been persuaded that exposure to tobacco smoke may also place nonsmokers at risk. Epidemiological and clinical studies suggest that exposure to Environmental Tobacco Smoke (ETS)—tobacco smoke exhaled by smokers combined with the smoke that escapes from the burning end of a tobacco product—can cause numerous ailments in nonsmokers, including eye and upper respiratory tract irritation, heart problems, birth defects and lung cancer. *See* Indoor Air Quality; Proposed Rule, 59 Fed. Reg. 15,967, 15,973–15,983 (1994) (to be codified at 29 C.F.R. Pts.1910, 1915, 1926 & 1928) (proposed April 5, 1994).

Responding to this medical evidence, federal public health officials have issued several reports outlining the dangers of ETS exposure. In a 1986 report, the Surgeon General concluded that exposure to ETS can cause cancer in adults and that children whose

parents smoke are at increased risk for respiratory ailments. *See* U.S. Environmental Protection Agency, *Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders* § 1.2 (1992) [*EPA Report*] (*citing* U.S. Department of Health and Human Services, *The Health Consequences of Involuntary Smoking, A Report of the Surgeon General* (1986)). Similar concerns prompted the Environmental Protection Agency in 1993 to issue a report classifying ETS as a Class A (known) Human Carcinogen and stating that exposure to ETS can worsen childhood asthma attacks and increase the risk of bronchitis and pneumonia in infants and small children. *See EPA Designates Passive Smoking a "Class A" or Known Human Carcinogen,* EPA ENVT'L NEWS (Jan. 7, 1993).

Against this backdrop, the New York City Council began deliberations in March 1994 on a proposal to strengthen the City's existing anti-smoking laws. After conducting public hearings and entertaining testimony from over 200 witnesses, the City enacted the Smoke–Free Air Act.

The Act severely restricts the smoking of tobacco products, including cigars. It prohibits or limits smoking in nearly all public places other than bars, billiard parlors, hotel lobbies, and a handful of other exempted locations. *See* Admin. Code § 17–505 (listing exempted locations). Under the City's Administrative Code, § 17–503(a), smoking is prohibited during operating hours in enclosed areas within public transportation and mass transportation facilities, public restrooms, retail stores, business establishments, libraries, museums and galleries, theaters, auditoriums, convention centers, sports arenas, health clubs, public meeting places, health care facilities, childrens' institutions, zoos, and elevators. Under § 17–503(c) smoking is also restricted in outdoor dining and seating areas and playgrounds, and under § 17–503(d) it is banned altogether in public and private day-care centers, pre-primary, primary and secondary educational facilities. Finally, under § 17–504 only restricted smoking is permitted in the workplace.

With respect to restaurants, which are the focus of plaintiff's challenge to the law, the Act completely prohibits smoking in dining areas of restaurants with more than 35 seats, except in special smoking rooms or bar areas of restaurants meeting certain criteria. Admin. Code. § 17–503(a)(5). One practical effect of these restrictions has been greatly to reduce the already small number of "cigar friendly" restaurants in the City. Plaintiff and like-minded lovers of cigars who wish to smoke with their meal now find their options extremely limited.

Hoping once again to enjoy the occasional Opus X in his favorite culinary establishments, plaintiff filed suit in May 1995 alleging that there is no reliable scientific evidence demonstrating that cigar smoke is harmful to nonsmokers and asserting that absent such evidence, the Act's limitations on such smoking bear no rational relationship to any legitimate governmental objective and therefore violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

After limited discovery, the defendants moved for summary judgment, arguing that the evidence proffered by plaintiff was not sufficient to demonstrate that the City lacked a rational basis for regulating cigar smoking. The district court agreed and granted the motion dismissing plaintiff's complaint. From this dismissal, plaintiff appeals only from the ruling on his due process claims. We affirm.

## DISCUSSION

### I Standard of Review

A motion for summary judgment may be granted only when no genuine issue of material fact is presented and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A grant of summary judgment is reviewed *de novo* on appeal. *Lowrance v. Achtyl,* 20 F.3d 529, 534 (2d Cir.1994). When deciding a summary judgment motion, a trial court's function is not to weigh the evidence, make credibility determinations or resolve issues of fact, *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994), but rather to determine whether,

drawing all reasonable inferences from the evidence presented in favor of the non-moving party, a fair-minded jury could find in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Where the evidence in the record could reasonably support a verdict in the non-moving party's favor, summary judgment is improper. *Id.*

■ Our task is to decide whether the district court erred in determining that there was no evidence in the record sufficient to support a finding that the City of New York lacked a rational basis for regulating cigar smoking. Legislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if "rationally related to a legitimate state interest." *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Accordingly, we will invalidate such a law on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose. *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976).

Several presumptions underlie appellant's challenge to the Act. He believes, first, that the City Council cannot simply hypothesize a scientific conclusion for the basis of the legislation because such legislation must be founded on scientific evidence. Second, Beatie suggests that the ban on cigars should not be sustained because it is in reality predicated on the unpopularity of secondary cigar smoke to some groups of citizens.

### A. Evolution of Rational Relationship Test

It is helpful in placing this appeal in its proper context to review briefly the history of the rational relationship test. A good beginning point is *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), decided over 90 years ago. Lochner, a Utica, New York baker, had been convicted under a New York law limiting to 60 the hours bakery employees could work, and his conviction had been upheld in New York's highest court. In reversing that conviction the Supreme Court ruled New York's law was not a legitimate exercise of its police power, but rather an arbitrary interference with Lochner's freedom to contract with his employees and thus violative of his substantive due process rights. Justice Holmes wrote in dissent "state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this." *Id.* at 75, 25 S.Ct. at 546 (Holmes, J., dissenting). Over 20 years later, while discussing the line legislatures must sometimes draw he said, presciently, again in a dissent, "when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928) (Holmes, J., dissenting).

In *United States v. Carolene Prods. Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938), the Court moved closer to Holmes' view when it observed that where legislative judgment is called into question and the question is debatable the decision of the legislature must be upheld if "any state of facts either known or which could reasonably be assumed affords support for it." A finding of a court or a jury verdict arrived at by weighing conflicting evidence may not substitute for it. *Id.*

■ As Justice Douglas, writing for the Court, said in *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), the day is long gone when legislation is required to be logically consistent with its aims to survive a constitutional challenge. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* In the area of economics or social welfare, the latter being the category under which this case falls, as distinct from those freedoms guaranteed citizens by the Bill of Rights, a state or one of its political subdivisions does not offend the Constitution simply because the correction of a particular

evil creates classifications that result in some inequality, so long as the classifications have a rational basis. *See Dandridge v. Williams*, 397 U.S. 471, 484–85, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970). Nor is it the role of courts to speculate whether the evils proposed to be ameliorated by the law could have been better regulated in some other fashion. *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 378, 93 S.Ct. 1652, 1665, 36 L.Ed.2d 318 (1973).

■ Moreover, it is not the state that must carry the burden to establish the public need for the law being challenged; it is up to those who attack the law to demonstrate that there is no rational connection between the challenged ordinance and the promotion of public health safety or welfare. *See Kelley v. Johnson*, 425 U.S. at 247, 96 S.Ct. at 1445. The Constitutional presumption in this area of the law is that the democratic process will, in time, remedy improvident legislative choices and that judicial intervention is therefore generally unwarranted. We will intervene in the extraordinary circumstance where it can only be concluded that the legislature's actions were irrational. *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979).

## B. *Rational Relationship Test Today*

■ Supreme Court jurisprudence now informs us that when reviewing challenged social legislation, a court must look for "plausible reasons" for legislative action, whether or not such reasons underlay the legislature's action. *See United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). To uphold the legislative choice, a court need only find some "reasonably conceivable state of facts that could provide a rational basis" for the legislative action. *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2100, 124 L.Ed.2d 211 (1993)). In other words, to escape invalidation by being declared irrational, the legislation under scrutiny merely must "find some footing" in the realities of the subject addressed by the law. *Heller*, 509 U.S. at 321, 113 S.Ct. at 2643.

■ Thus, it may be seen that today it is very difficult to overcome the strong presumption of rationality that attaches to a statute. We will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, *Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 50, 86 S.Ct. 1254, 1263, 16 L.Ed.2d 336 (1966), because the problem could have been better addressed in some other way, *Mourning*, 411 U.S. at 378, 93 S.Ct. at 1665 or because the statute's classifications lack razor-sharp precision, *Dandridge*, 397 U.S. at 485, 90 S.Ct. at 1161. Nor will a statute be overturned on the basis that no empirical evidence supports the assumptions underlying the legislative choice. *Vance*, 440 U.S. at 110–11, 99 S.Ct. at 949–50. To succeed on a claim such as this, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* at 111, 99 S.Ct. at 949.

■ So long as they do not burden fundamental rights or single out suspect classifications, lawmakers are free to engage in "rational speculation unsupported by evidence." *Beach Communications*, 508 U.S. at 315, 113 S.Ct. at 2102. With these principles in mind, we turn to the propriety of the district court's grant of summary judgment dismissing plaintiff's complaint.

## II  Application of Test to Instant Case

■ In the case at hand, the City moved for summary judgment on the ground that the plaintiff had not established that it was irrational for the City to limit cigar smoking. In support of its motion, it submitted an affidavit from Richard M. Weinberg, Esq., General Counsel to the New York City Council. In his affidavit, Mr. Weinberg identifies various materials on the basis of which it might reasonably be thought that both cigars and cigarettes are harmful and that placing limits on cigar smoking would protect the health of nonsmokers. Among other materials, the affidavit points to (i) studies on the dangers of ETS exposure that group all to-

bacco products together and indicate that cigars and cigarettes are equally harmful, *see, e.g., EPA Report, supra;* (ii) studies showing that the chemical composition of cigar smoke is similar to that of cigarette smoke and that both contain carcinogens, *see, e.g.,* U.S. Department of Health and Human Services, *Reducing the Health Consequences of Smoking: 25 Years of Progress* (1989); and (iii) studies suggesting that cigar smoke may be more dangerous than cigarette smoke, *see, e.g.,* C. Claiborne Ray, *Q & A: Pipes and Cigars,* N.Y. Times, Nov. 23, 1993, at C6 (one cigar produces more particle emissions than three cigarettes, and 30 times the carbon monoxide emissions of a single cigarette); Elizabeth T.H. Frontam et al., *Environmental Tobacco Smoke and Lung Cancer in Nonsmoking Women: A Multicenter Study,* 271 JAMA 1752 (1994) (among non-smoking women those whose spouses smoked cigars rather than cigarettes had higher risk of lung cancer).

Plaintiff responds that genuine issues of material fact exist because the parties disagree on whether the studies cited in the counsel's affidavit provide a reliable basis for concluding that cigar smoke is harmful to nonsmokers. For example, plaintiff has submitted affidavits from experts who opine that no reliable evidence links cigar smoking and health risks and that studies on the negative effects of cigarette smoke do not necessarily apply to cigar smoke. Plaintiff also submits scientific studies indicating, among other things, that inhalation of certain kinds of cigar smoke does less harm to rats than cigarette smoke. *See* T.E. Betts, J.P. O'Sullivan & L.A. Elson, *Comparative Lung Pathology of Rats After Exposure to Cigarette and Cigar Smoke,* 62 Br. J. Exp. Path 62 (1981). Although plaintiff does not deny that the studies cited by the defendants actually exist, he questions their persuasive weight.

The facts plaintiff points to are insufficient to bar summary judgment. At best, plaintiff's evidence suggests a lack of direct empirical support for the assumption that cigar smoke is as harmful as cigarette smoke or his evidence might demonstrate the existence of a scientific dispute over the risks in question. But no matter how plaintiff's proof is viewed it will not serve to rebut the presumption that the statute has a rational basis. In light of lawmakers' freedom to engage in "rational speculation unsupported by evidence," *Beach Communications,* 508 U.S. at 315, 113 S.Ct. at 2102 it cannot be said to be irrational for the New York City Council to conclude that cigar smoke might be harmful. And that is all the Constitution demands. Contrary to plaintiff's arguments, due process does not require a legislative body to await concrete proof of reasonable but unproven assumptions before acting to safeguard the health of its citizens. Thus, although the parties dispute the existence of and weight of direct scientific proof of cigar smoke's dangers, that dispute is not a material issue of fact in considering whether to grant summary judgment.

Moreover, to succeed on a substantive due process challenge, a plaintiff must do more than show that the legislature's *stated* assumptions are irrational—he must discredit any conceivable basis which could be advanced to support the challenged provision, regardless of whether that basis has a foundation in the record, *Heller,* 509 U.S. at 320–21, 113 S.Ct. at 2642–43 or actually motivated the legislature, *Beach Communications,* 508 U.S. at 315, 113 S.Ct. at 2102. Otherwise stated, once the legislature's action has been shown to have some plausible rationale, a court's inquiry is at an end. *United States R.R. Retirement Bd.,* 449 U.S. at 179, 101 S.Ct. at 461.

## CONCLUSION

On this record, no reasonable jury could fail to find that there was a conceivable basis upon which the City Council might believe that second-hand cigar smoke could be harmful to nonsmokers. Consequently, placing limits on cigar smoking is rationally related to the government's legitimate interest in protecting the health of its citizens. There being a plausible basis for the statute, the district court correctly granted summary judgment in the defendants' favor.

Affirmed.