171 F.3d 765
 Fed. Carr. Cas. P 84,089
ACE AUTO BODY & TOWING, LTD.; Atlam Towing Service, Inc.;
Bangs Towing, Inc.; Ben's Towing Service; Bills Towing
Service, Inc.; Bragg Towing Co.; Broadway Auto Service,
Inc.; C & J Collision Service, Inc.; Charles Schmidt and
Sons, Inc.; Chester's Highway Garage of PW, Inc.; CK
Towing, Inc.; Dave's Heavy Towing, Inc.; Do-Rite Reliable
Towing, Inc.; Efficiency Enterprise, Inc.; East Coast
Industrial Uniform Corp.; F & B Truck Repair & Maintenance,
Inc.; Galasso Trucking, Inc.; Gesco Ice Cream Vending
Corp.; Hendrickson Towing, Inc.; Kenny's Fleet
Maintenance, Inc.; Leonard Auto Body; Marjam Supply Co.,
Inc.; Model Towing & Recovery, Inc.; Murray Rude Services,
Inc.; Parkview Towing Corp.; Plaza Ambulette Service,
Inc.; Rapid Armored Corporation; Sunny Day Enterprise
Industries, Ltd.; Tommy Bug Auto Repairs, Inc.; Ultimate
Transport, Inc.; Zant Pre Inc., doing business as presant
glass, Plaintiffs-Appellants-Cross-Appellees,
v.
The CITY OF NEW YORK, Defendant-Appellee-Cross-Appellant.
 Docket Nos. 97-9499, 97-9551.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 1, 1998.
Decided March 26, 1999.
 
 Bruce J. Robbins, Eastchester, New York, for Plaintiffs-Appellants-Cross-Appellees.
 Mordecai Newman, New York, New York (Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, Larry A. Sonnenshein, Robin Binder, New York, New York, of counsel), for Defendant-Appellee-Cross-Appellant.
 Before: NEWMAN, CARDAMONE, and PARKER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Looming over our Republican form of government, where each state in the exercise of sovereignty enacts its own laws, lies the Supremacy Clause of the U.S. Constitution, from which clause has been derived a legal concept known--to judges and lawyers, if not to laypersons--as preemption. Preemption, the doctrine by which federal law supplants contrary state and local law, is the subject of this appeal. Plaintiffs, who are members and affiliates of the regional and New York City tow truck industry, filed an action against the defendant City in the United States District Court for the Southern District of New York (Denise Cote, Judge) challenging a City ordinance aimed at eliminating the practice of "chasing"--where tow trucks race one another to an accident scene in competition for business--on the grounds that the regulation of intrastate towing is a field explicitly preempted by federal law. The challenge was turned down.
 
 
 2
 This appeal requires us to determine the extent to which a federal statute, 49 U.S.C. § 14501(c), preempts New York City laws regulating the municipal tow truck industry and, in addition, on the City's cross-appeal, to determine whether such preemption is beyond Congress' authority under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3.
 
 BACKGROUND
 A. The New York City Towing Laws
 
 3
 New York City laws governing municipal towing are codified in the City Administrative Code (Admin.Code), Title 20, Chapter 2, Subchapter 31, §§ 20-495 to -528 (1996). The implementing regulations, promulgated by the New York City Department of Consumer Affairs (Department), are found in the Rules of the City of New York (RCNY), Title 6, Chapter 2, Subchapter EE, §§ 2-361 to -376 (1995). Because these laws are voluminous and were examined in detail by the district court, see Ace Auto Body & Towing, Ltd. v. City of New York, No. 96 Civ. 6547(DLC), 1997 WL 669891, at * 1-* 4 (S.D.N.Y. Oct. 28, 1997) (Ace ), we limit our discussion to those aspects most pertinent to this appeal.
 
 1. General Towing Requirements
 
 4
 The City towing laws require tow truck businesses and operators employed by them to be licensed to engage in towing by the Department. See Admin. Code § 20-496. To qualify for a license, a towing company must maintain liability insurance, post a surety bond or cash alternative, and demonstrate that its principals have no relevant criminal history. See Admin. Code §§ 20-498(a), -499, -500; 6 RCNY §§ 2-362, -375. License requirements for operators include a minimum age of 18 years, possession of an appropriate driver's license, and lack of traffic or criminal convictions. See Admin. Code § 20-498; 6 RCNY § 2-364. Additional rules govern the mechanical safety of tow trucks, the information displayed on trucks, reporting, and recordkeeping. See Admin. Code §§ 20-501, -503, -507; 6 RCNY §§ 2-363, -365.
 
 
 5
 2. DARP and SARD Accident Management Programs
 
 
 6
 Under its towing laws, the City has established two management programs applicable to vehicles disabled by accidents and weighing less than 15,000 pounds: the Directed Accident Response Program (DARP), see Admin. Code § 20-518; and the Special Accident Response Districts Program (SARD), see id. § 20-518.1. The legislative history informs us, and plaintiffs concede, that both programs were adopted to eliminate the practice of "chasing," in which tow truck operators monitor police radio transmissions to learn of vehicular accidents and then race each other, often recklessly, to accident scenes to earn fees from the resultant towing and ancillary repair work.
 
 
 7
 Under DARP, the Department has divided New York City into zones, and it maintains a list of qualified towing companies in each zone. See id. § 20-518(a)(2). As accidents occur within a given zone, the Police Department summons an approved towing company to the accident scenes on a rotating basis. The number of qualified companies per zone is not limited. However, it is important to note that a disabled vehicle to which DARP applies must be removed by an approved tower summoned by the police; it cannot be removed by a tower called independently by the operator of the disabled vehicle. See id. § 20-518(b)(1).
 
 
 8
 Under SARD, enacted to supplement DARP, the Department has designated certain City areas as districts and then subdivided each district into zones. One towing company per zone has exclusive responsibility for removing all vehicles in that zone for a specified period of time; other companies are not permitted to tow, even when called by the motorists involved. See id. § 20-518.1(a)(1), (c)(1). The maximum number of companies allowed to tow within a SARD zone is three, and if more than three meet certain initial requirements, then the three authorized are chosen by lottery. See id. § 20-518.1(a)(1), (b)(2); 6 RCNY § 2-371.1(d).
 
 
 9
 DARP and SARD participants are, in addition, required to maintain their own storage and repair facilities. See Admin. Code § 20-518(b)(3) (DARP); 6 RCNY § 2-371(h)-(n) (DARP); Admin. Code § 20-518.1(b)(1)(h) (SARD); 6 RCNY § 2-371.1(e)-(i) (SARD).
 
 3. Rotation Tow Program
 
 10
 The City towing laws also establish the Rotation Tow Program (ROTOW). As its name suggests, ROTOW (like DARP) authorizes companies to tow vehicles on a rotating basis; however, ROTOW applies only to motor vehicles "suspected of having been stolen or abandoned," as well as to certain other unattended vehicles. See Admin. Code § 20-519(a)(1). ROTOW companies must meet criteria ensuring their ability to remove vehicles promptly, see 6 RCNY § 2-372(e)-(h), and they must maintain storage facilities that meet specified requirements, see id. § 2-372(i).
 
 4. Towing Rates
 
 11
 The towing laws also prescribe maximum rates for towing and storage of all vehicles, whether or not the tow in question is governed by DARP or SARD. See Admin. Code § 20-509; 6 RCNY § 2-368. Flat rates for towing and storage are specified for vehicles towed under ROTOW. See Admin. Code § 20-519(c)(1).B. The Federal Law: 49 U.S.C. § 14501(c)
 
 
 12
 It is in this context of municipal governance that plaintiffs allege that the New York City towing laws are preempted by 49 U.S.C. § 14501(c). That statute declares a state or municipality "may not enact or enforce a law ... related to a price, route, or service of any motor carrier ... with respect to the transportation of property." 49 U.S.C. § 14501(c)(1) (1994 & Supp. I 1995) (codifying the FAA Authorization Act of 1994, Pub.L. No. 103-305, § 601(c), 108 Stat. 1569, 1606, as amended by the ICC Termination Act of 1995, Pub.L. No. 104-88, § 103, 109 Stat. 803, 899).
 
 
 13
 At the same time, subdivision (2) of § 14501(c), entitled "Matters Not Covered," exempts various categories of motor carrier regulation from preemption, two of which are relevant in the case at hand. First, the prohibition on state and local regulation does not
 
 
 14
 restrict the safety regulatory authority of a State with respect to motor vehicles ... or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.
 
 
 15
 Id. § 14501(c)(2)(A). Second, this prohibition
 
 
 16
 does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law ... relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.
 
 
 17
 Id. § 14501(c)(2)(C).
 
 C. The District Court's Decision
 
 18
 Believing, as noted, that § 14501(c) preempted the City's towing laws, plaintiffs sued the City on August 28, 1996 seeking declaratory and injunctive relief against enforcement of those laws. On October 27, 1997 Judge Cote issued an opinion and order granting in part and denying in part the parties' cross-motions for summary judgment, and judgment was entered three days later. See Ace, 1997 WL 669891.
 
 
 19
 In ruling on the parties' cross-motions for summary judgment, the district court held that the towing laws largely withstood plaintiffs' preemption challenge. See id. at * 7-* 11. It reasoned that although § 14501(c)(1) generally preempted intrastate regulation of vehicular towing, the safety and financial responsibility exceptions under § 14501(c)(2)(A) were sufficiently broad to exempt the City towing laws from preemption with respect to the SARD, DARP, and ROTOW programs as well as the licensing and eligibility requirements. See id.
 
 
 20
 At the same time the district court ruled that City laws regulating rates for nonconsensual tows were saved from preemption by § 14501(c)(2)(C), it also ruled that the laws pertaining to consensual tow rates were preempted. See id. at * 11. Further, Judge Cote declined to find that preemption of the nonconsensual tow rate regulations exceeded Congress' Commerce Clause power. See id. at * 11-* 12. From this October 1997 judgment plaintiffs appeal, and the City of New York cross-appeals. We affirm the result reached in the district court, although for somewhat different reasons.
 
 DISCUSSION
 I Standard of Review
 
 21
 On appeal, a grant of summary judgment is reviewed de novo to determine whether the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991) (discussing summary judgment standard). Because in the present litigation all parties concede the lack of a genuine factual dispute, the only inquiry is which party is entitled to judgment as a matter of law.
 
 II Preemption
 
 22
 The Supremacy Clause of the U.S. Constitution declares that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a consequence, state and local laws are preempted where they conflict with the dictates of federal law, and must yield to those dictates. See, e.g., Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 210-11, 6 L.Ed. 23 (1824); National Helicopter Corp. v. City of New York, 137 F.3d 81, 88 (2d Cir.1998). Preemption " 'may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting FMC Corp. v. Holliday, 498 U.S. 52, 56-57, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990)).
 
 
 23
 Where, as with 49 U.S.C. § 14501(c), a federal statute expressly preempts state or local law, "analysis of the scope of the pre-emption statute must begin with its text." Medtronic, Inc. v. Lohr, 518 U.S. 470, 484, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). And, we must also " 'start with the assumption that the historic police powers of the States [are] not to be superseded ... unless that was the clear and manifest purpose of Congress.' " Id. at 485, 116 S.Ct. 2240 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). As such, Congress' purpose is the "ultimate touchstone" of preemption analysis. Id. (quoting Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)).
 
 
 24
 A. Preemption Under 49 U.S.C. § 14501(c)(1)
 
 
 25
 The parties before us do not disagree that § 14501(c)(1) generally preempts state and local regulation of the intrastate towing industry. See Harris County Wrecker Owners for Equal Opportunity v. City of Houston, 943 F.Supp. 711, 722 (S.D.Tex.1996); H.R.Rep. No. 104-311, at 119 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 831 (explaining that the 1995 amendments, which added subsection (c)(2)(C) exempting nonconsensual tow rates from preemption, were "not intended to permit re-regulation of any other aspect of tow truck operations").
 
 
 26
 The City asserts that, in this context, § 14501(c)(1) does not preempt its regulation of storage and repair facilities because the term "transportation" as used in that subsection includes neither storage nor repair. On this point, the City refers to Rhode Island Pub. Towing Ass'n v. Rhode Island, Civ. No. 96-454ML, 1997 WL 135571 (D.R.I. Feb.28, 1997), which relied upon a definition obtained from Black's Law Dictionary 1344 (5th ed.1979), that defines the word "transportation" as encompassing the "movement of goods or persons from one place to another, by a carrier." Rhode Island Pub. Towing Ass'n, 1997 WL 135571, at * 6. This definition is, of course, accurate as far as it goes, but it ignores the broader statutory definition that Congress intended to apply to § 14501:
 
 
 27
 The term "transportation" includes--
 
 
 28
 (A) a motor vehicle ... or equipment ... related to the movement of passengers or property, or both ...; and
 
 
 29
 (B) services related to that movement, including ... storage, handling, packing, unpacking, and interchange of passengers and property.
 
 
 30
 49 U.S.C. § 13102(19) (1994 & Supp.1995). Because the statutory definition explicitly broadens "transportation" to include storage, and because services related to the movement of passengers or property easily include repair, we decline to adopt the City's narrow construction of the term "transportation."B. Exemption from Preemption Under § 14501(c)(2)
 
 
 31
 The principal question raised by plaintiffs is the extent to which the New York City towing laws are saved from preemption by language in § 14501(c)(2)(A), which preserves the "safety regulatory authority of a State with respect to motor vehicles" as well as the "authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements." Id. § 14501(c)(2)(A). Specifically, plaintiffs contend that the City towing laws are so sweeping in their restrictive effects as to bar many companies from entering the municipal towing market. For this reason, they urge us to find that the towing laws constitute de facto economic regulation, contrary to the congressional aim of § 14501(c)(1) to deregulate, and that therefore the towing laws should not be ruled exempt from preemption. The City, for its part, concedes the preemption of those laws setting maximum rates for consensual towing, but insists that its laws otherwise fall entirely within the safety and financial responsibility exemptions from preemption.
 
 
 32
 Hence, the precise issue before us is whether the City towing laws are properly characterized under § 14501(c) as safety and financial responsibility regulations or as economic regulations. In addressing this issue, we find it helpful first to examine the text and history of the statute in order to ascertain Congress' purpose, which, as noted, is the gauge by which preemption analysis is measured.
 
 1. Congressional Purpose
 
 33
 Statutory History. Section 14501(c) was originally enacted and codified at 49 U.S.C. § 11501(h), without the present exemption for regulation of nonconsensual tow rates, by the Federal Aviation Administration Authorization Act of 1994 (FAA Authorization Act), Pub.L. No. 103-305, § 601(c), 108 Stat. 1569, 1606. As such, § 11501(h)(1) preempted state and local regulation of any "price, route, or service of any motor carrier ... with respect to the transportation of property," and § 11501(h)(2)(A) exempted state and local authority with respect to safety and financial responsibility regulations.
 
 
 34
 The House Conference Report that accompanied the legislation indicates that the purpose behind § 11501(h)(1) was to free the motor carrier industry from state and local regulation and to put that industry on a playing field level with that of the air carrier industry, which had already been deregulated by the Airline Deregulation Act of 1978. See H.R. Conf. Rep. No. 103-677, at 85, 87 (1994), reprinted in 1994 U.S.C.C.A.N. 1715, 1757, 1759. In so doing, Congress hoped to eliminate the competitive advantage air carriers, such as Federal Express, had enjoyed under decisions interpreting the 1978 statute, relative to motor carriers, like United Parcel Service. See id. (citing Federal Express Corp. v. California Pub. Utils. Comm'n, 936 F.2d 1075 (9th Cir.1991)).
 
 
 35
 The House Conference Report further clarifies that the exemptions from preemption under § 11501(h)(2)(A) simply reflect the fact "that State authority to regulate safety, financial fitness and insurance ... of motor carriers is unchanged since State regulation in those areas is not a price, route or service and thus is unaffected." Id. at 85, reprinted in 1994 U.S.C.C.A.N. at 1757; see also id. at 84, reprinted in 1994 U.S.C.C.A.N. at 1756 ("[N]othing in these new subsections contains a new grant of Federal authority to a State.... The intention of the conferees is solely to identify certain areas that are not preempted...."). The Report nonetheless explicitly qualifies these exemptions, stating, "[t]he conferees do not intend for States to attempt to de facto regulate prices, routes or services of intrastate trucking through the guise of some form of unaffected regulatory authority." Id.
 
 
 36
 Just one year after its enactment, § 11501(h) was recodified at 49 U.S.C. *773s 14501(c)--with an added exemption for state regulation of nonconsensual tow rates--by the Interstate Commerce Commission Termination Act of 1995 (ICC Termination Act), Pub.L. No. 104-88, § 103, 109 Stat. 803, 899. The House Report that accompanied the legislation notes that the added provision "struck a balance between the need to protect consumers from exorbitant towing fees and the need for a free market in towing services." H.R.Rep. No. 104-311, at 120, reprinted in 1995 U.S.C.C.A.N. at 793, 832. Accordingly, the provision was "not intended to permit re-regulation of any other aspect of tow truck operations." Id. at 119, reprinted in 1995 U.S.C.C.A.N. at 831.
 
 
 37
 Statutory Text. In its current incarnation, 49 U.S.C. § 14501(c)(1) continues to preempt any state or local law "related to a price, route, or service of any motor carrier ... with respect to the transportation of property." Although we have not previously had an opportunity to construe this provision of the law, we are not entirely without guidance in this endeavor. See Californians for Safe & Competitive Dump Truck Transp. v. Mendonca, 152 F.3d 1184, 1187-89 (9th Cir.1998) (interpreting the "related to" language of § 14501(c)(1) by reference to similar language in other statutes); Deerskin Trading Post, Inc. v. United Parcel Serv., Inc., 972 F.Supp. 665, 667-72 (N.D.Ga.1997) (same).
 
 
 38
 The House Conference Report to the FAA Authorization Act explains that § 14501(c) was "intended to function in the exact same manner with respect to its preemptive effects" as 49 U.S.C. § 41713(b)(4), which contains similar "related to" language. H.R. Conf. Rep. No. 103-677, at 85, reprinted in 1994 U.S.C.C.A.N. at 1757. The Supreme Court, in turn, has twice interpreted the predecessor of 49 U.S.C. § 41713(b)(4) by reference to similar "relate to" language in the Employee Retirement Income Security Act of 1974 (ERISA), as codified at 29 U.S.C. § 1144(a). See American Airlines, Inc. v. Wolens, 513 U.S. 219, 223-24, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995); Morales v. Trans World Airlines, Inc., 504 U.S. at 383-84, 112 S.Ct. 2031; see also H.R. Conf. Rep. No. 103-677, at 83, reprinted in 1994 U.S.C.C.A.N. at 1755 (explaining that the 1994 revision and recodification of the predecessor to 49 U.S.C. § 41713 were not intended to alter the construction given in Morales ).
 
 
 39
 Recently we had occasion to explain that interpretation of the "relate to" language of ERISA ultimately "should be guided by common sense." Plumbing Indus. Bd., Plumbing Local Union No. 1 v. E.W. Howell Co., 126 F.3d 61, 67 (2d Cir.1997). There, we elaborated:
 
 
 40
 [T]he Supreme Court has instructed that analysis under ERISA's preemption clause must begin with the starting presumption that Congress does not intend to supplant state law, and [has] admonished courts applying the preemption clause to look ... to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.... Hence, to overcome the anti-preemption presumption, a party challenging a statute must convince a court that there is something in the practical operation of the challenged statute to indicate that it is the type of law that Congress specifically aimed to have ERISA supersede.
 
 
 41
 Id. at 66-67. In the context of the quoted case, we ruled that a state law that "refer[red] to" or had "a clear connection with" an ERISA plan would suffer preemption under the "relate to" language. Id. at 67. At the same time, we also found the presumption against preemption--because Congress does not aim to supplant state law--would not be overcome where the effects of state law on ERISA plans were only incidental and not coercive. See id. (citing De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 816 & n. 16, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997)).
 
 
 42
 Guided by this precedent, we adopt a similar approach to § 14501(c) and its application to the New York City towing laws. On the one hand, as discussed earlier, the broad "related to" language of § 14501(c)(1) generally preempts economic regulation by the states within the field of intrastate towing. On the other hand, the statutory text, Congress' aim to leave the states' residual control over safety and other local concerns intact, and the presumption against preemption of historic state police power, argue against finding preemption where only incidental economic burdens can be discerned. In the present circumstances, where these competing concerns collide, we are persuaded, for reasons we will explain in a moment, that the starting presumption against preemption of state law has not been overcome.
 
 
 43
 2. Application to the New York City Towing Laws The DARP, SARD, and ROTOW Programs
 
 
 44
 At first blush, the purposes of the DARP, SARD, and ROTOW programs appear to be safety and not economic in nature. Plaintiffs do not dispute that the DARP and SARD programs were enacted to combat the practice of "chasing" described earlier. In a similar safety vein, as the district court noted, the ROTOW program is aimed at "removing abandoned and stolen vehicles that may (for example) present hazards to other motorists or opportunities for misuse to criminals or children." Ace, 1997 WL 669891, at * 7.
 
 
 45
 An examination of the basic structure of these towing programs confirms this initial impression. The rotational system they employ attempts to curtail the competitive incentives that motivate the practice of chasing. Quite simply, requiring towers to service disabled vehicles on a rotating basis eliminates other towers from competing for fees. Further, neither DARP nor ROTOW limit the number of participants in the program or bar towing companies based outside the City from participating. Although the zoning system adopted by SARD limits the number of participants per zone, its legislative history reveals the program was adopted because DARP failed to eliminate chasing in several City precincts. Hence, it is difficult to treat these programs as a guise for economic regulation. As a consequence, the City of New York's rotational towing programs are sufficiently safety-oriented to survive preemption under § 14501(c). See Harris County Wrecker Owners for Equal Opportunity v. City of Houston, 943 F.Supp. at 732 (supporting this reading of rotational towing programs).
 
 
 46
 Plaintiffs aver that the safety exemption of § 14501(c)(2)(A) does not permit such a broad construction. Specifically, they insist that the exemption extends only to safety regulation of the mechanical components of motor vehicles, e.g., windshield wipers and brakes, and not to municipal management of vehicular accidents. In support of this view, they point out that § 14501(c)(2)(A) exempts only "the safety regulatory authority of a State with respect to motor vehicles" and not with respect to "motor carriers," a term used elsewhere by the statute to denote persons "providing motor vehicle transportation for compensation," 49 U.S.C. § 13102(12) (1994 & Supp.1995).
 
 
 47
 Neither the text nor the legislative history of § 14501(c)(2)(A) supports such a narrow reading, as the district court correctly observed. See Ace, 1997 WL 669891, at * 8-* 9. To the extent that the text's usage of the term "motor vehicles" creates an ambiguity, this ambiguity does not exclude the possibility of interpreting the phrase "safety regulatory authority ... with respect to motor vehicles" to encompass the authority to enact safety regulations with respect to motor vehicle accidents and break-downs. Construing the text in this fashion fully comports with Congress' purpose to leave intact state and local safety regulatory authority under 49 U.S.C. § 14501(c).
 
 
 48
 In addition, to the extent that our reading of the safety exemption may touch upon delicate matters of public policy, this view carefully tracks the interpretation given by the U.S. Department of Transportation. See U.S. Dep't of Transp., Intrastate Trucking Deregulation: An Analysis and Interpretation of Title VI, Federal Aviation Administration Authorization Act of 1994, P.L. 103-305 (Mar.1995) (Intrastate Trucking Deregulation) ("[W]e believe that State or local regulations governing the towing of damaged or abandoned vehicles that are public safety hazards would fall within this exemption, assuming again that such regulations are not a guise for broader economic restrictions."). Even were the City's regulations to impose incidental economic constraints on free market competition, the presumption against preemption of state police authority, see Medtronic, 518 U.S. at 485, 116 S.Ct. 2240, tips the balance decidedly in the City's favor.[1]
 
 C. Eleventh Circuit's Contrary View
 
 49
 In holding that 49 U.S.C. § 14501(c)(2)(A) preserves the New York City towing laws, we part from R. Mayer of Atlanta, Inc. v. City of Atlanta, 158 F.3d 538 (11th Cir.1998). There, the Eleventh Circuit held that safety regulations enacted by the City of Atlanta to govern its municipal towing industry were not exempt from preemption for the reason that § 14501(c)(2)(A) exempts only state regulatory authority and not local or municipal regulatory authority. Id. at 545-48.
 
 
 50
 In reaching this conclusion, Mayer relied largely on two arguments. First, the Eleventh Circuit reasoned that the term "State" as used in § 14501 is defined to include only the 50 states and the District of Columbia, see 49 U.S.C. § 13102(18) (1994 & Supp. I 1995), and that the text of subsection (c)(2)(A) preserves only the "authority of a State," whereas all other provisions within § 14501 explicitly refer to political subdivisions of the state. See 158 F.3d at 545. Second, that court thought that disallowing towing regulation at the local level furthers Congress' purpose to deregulate the intrastate motor carrier industry, insofar as its reading of § 14501 would eliminate the patchwork of safety regulations enacted by localities within each state. See id. at 546.
 
 
 51
 We think these arguments do not carry the day in our case. Granted, the text of § 14501(c)(2)(A), unlike other subsections of § 14501, fails to preserve explicitly the regulatory authority of the political subdivisions of the state. But we see no reason to construe this language to prevent the state from delegating its regulatory authority to a municipality. To the contrary, the legislative history indicates that state safety regulatory authority (including, presumably, the authority to delegate) was to be "unaffected" by the preemption statute. See H.R. Conf. Rep. No. 103-677, at 84, 85, reprinted in 1994 U.S.C.C.A.N. at 1756, 1757; AJ's Wrecker Serv., Inc. v. City of Dallas, Nos. 97-1311D, 97-2398D, 1998 WL 185521, at * 3 (N.D. Tex. April 15, 1998); Harris County Wrecker Owners, 943 F.Supp. at 726-27; see also Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 607-09, 611-12, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (noting that although FIFRA expressly permits only "States" to regulate pesticides, the most "plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the 'absolute discretion' of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities"); Environmental Encapsulating Corp. v. City of New York, 855 F.2d 48, 54-55 (2d Cir.1988) (holding that usage of the term "state" in OSHA preemption provision also encompassed municipalities). But see CSX Transp., Inc. v. City of Plymouth, 86 F.3d 626, 628-29 (6th Cir.1996) (holding that usage of the term "State" in FRSA exemption provision did not encompass municipalities). Here, authority for the New York City towing laws rests on precisely this sort of delegation from the State of New York. See N.Y. Veh. & Traf. Law § 1642(a)(15) (McKinney 1996) (delegating towing regulatory authority to cities of population over one million).
 
 
 52
 Further, although the legislative history clearly illustrates Congress' deregulatory purpose, the history is ambiguous as to the scope of that purpose. More particularly, the reports issued in connection with § 14501 suggest that its primary purpose was to eliminate local economic regulation, not local safety regulation. See H.R. Conf. Rep. No. 103-677, at 86-87, reprinted in 1994 U.S.C.C.A.N. at 1758-59. To the extent that the scope of Congress' purpose is unclear, we hesitate to construe the text of § 14501 so as to frustrate unnecessarily the ability of municipalities to respond to the local safety concerns created by local towing industries. Such hesitance, furthermore, is consistent with the presumption against preemption of state and local regulations enacted under their historic police powers. See Medtronic, 518 U.S. at 485, 116 S.Ct. 2240.
 
 
 53
 Moreover, the U.S. Department of Transportation has clarified its view that § 14501(c)(2)(A) exempts both "State [and] local regulations" from preemption. U.S. Dep't of Transp., Intrastate Trucking Deregulation. Admittedly, we are not bound to accept this view of § 14501(c)(2)(A). Compare Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that where the text of a statute is ambiguous, courts must defer to any permissible interpretation given by the agency charged with its administration), with 49 U.S.C. § 13506(b)(1), (3) (1994 & Supp. I 1995) (Secretary of Transportation lacks jurisdiction over municipal transportation and emergency towing). But, to the extent that our reading of § 14501 may implicate questions of expertise in the field of motor carrier regulation, the Department's statement suggests that our reading is consistent with sound public policy.
 
 
 54
 As a consequence, we decline to follow Mayer, 158 F.3d 538, and hold instead that 49 U.S.C. § 14501(c)(2)(A) does not limit the authority of a state to delegate its towing regulatory authority to local or municipal governments.
 
 D. Licensing and Eligibility Requirements
 
 55
 In addition to challenging the DARP, SARD, and ROTOW programs generally, plaintiffs also challenge the City's specific requirements regarding licensing, display of information, reporting, recordkeeping, criminal history, insurance, posting of bond, and maintenance of storage and repair facilities. Most of these requirements are so directly related to safety or financial responsibility and impose so peripheral and incidental an economic burden that no detailed analysis is necessary to conclude that they fall within the § 14501(c)(2)(A) exemptions. Although the bonding requirement does present the potential for abuse, the record reflects that the actual economic burdens are minimal. See Roberto Velez Decl. p 4 (explaining that towing businesses must either post $5,000 bond or contribute $200 to trust fund); see also Admin. Code § 20-499 (contribution to fund satisfies bond requirement).
 
 
 56
 The storage and repair requirements concededly present a more difficult question. Plaintiffs' attack on this issue appears to focus not on the City's regulation of vehicle storage and repair per se, but rather on the City's requirement that eligible towing companies maintain their own storage and repair facilities. In plaintiffs' view, these facilities requirements impose substantial barriers to market entry by new businesses insofar as they increase the cost of qualifying to participate in the City's exclusive towing programs. Plaintiffs observe, in addition, that many of the safety goals cited by the district court in support of these requirements, e.g., reducing the number of hazardous tows of damaged vehicles from one site to another, see Ace, 1997 WL 669891, at * 10, could be met by a scheme that would impose a lesser economic burden on competition in the towing industry. The City could, for example, allow towing companies to subcontract with other facilities for storage and repair services, but still meet its safety goals by regulating the subcontracting of storage and repair.
 
 
 57
 Plaintiffs' hypothesis of a less restrictive regulatory scheme does carry a certain appeal, in light of the substantial economic burdens imposed by the City's storage and repair regulations. But preemption analysis does not insist upon a least restrictive means test. For these regulations to escape federal preemption, it is enough, in light of the text and history of § 14501(c), that the storage and repair provisions are reasonably related to the safety aspects of towing disabled vehicles and that the economic burdens thereby imposed are only incidental. Above and beyond the need to eliminate chasing, a disabled motor vehicle clearly presents a safety hazard in a municipality where vehicular traffic is so heavy, and the City has an obligation to make arrangements for its removal from the road and to place it in safe-keeping. And, because the economic burdens on interstate commerce are only incidental, the presumption against preemption of a state's police power to effect that removal supports preserving the City's storage and repair regulations. See Plumbing Indus. Bd., 126 F.3d at 67 (incidental burdens insufficient to overcome presumption against preemption where ERISA statute used similar "relate to" language).
 
 E. Towing Rates
 
 58
 As stated, the City concedes its regulations governing rates for consensual tows are preempted, in light of the language of § 14501(c)(2)(C) exempting such regulations from preemption only when they apply to nonconsensual tows. For their part, plaintiffs do not dispute that § 14501(c)(2)(C) generally exempts nonconsensual tow rate regulations. Rather, plaintiffs argue that Congress intended the provision to apply to tows that are nonconsensual solely by virtue of the owner's or driver's physical incapacity at the accident scene, and not to tows that are nonconsensual solely because the City's rotational system dictates the tower be summoned to the scene by the Police Department.
 
 
 59
 In support of this view, the sole evidence offered by plaintiffs is the following statement, taken from the Congressional Record:
 
 
 60
 Nonconsensual towing situations are those where the owner of the vehicle is unable to consent to it being towed, such as in cases of a severe accident, where the vehicle is towed from a commercial establishment for being illegally parked, or towed from city streets as a result of police order.
 
 
 61
 141 Cong. Rec. H15600-02 (daily ed. Dec. 22, 1995) (statement of Rep. Rahall). This statement, we think, is at best ambiguous. There is no indication either that the list of examples of nonconsensual tows was meant to be exclusive, or that the phrase "unable to consent" should otherwise be construed in so restricted a fashion.
 
 
 62
 More to the point, the plain language of § 14501(c)(2)(C) clearly encompasses any tow "performed without the prior consent or authorization of the owner or operator of the motor vehicle," regardless of the reason for the lack of consent. See also H.R. Conf. Rep. No. 104-422, at 219 (1994), reprinted in 1995 U.S.C.C.A.N. 850, 904 ("Non-consent tows occur when vehicle owners/operators are unable to give their voluntary consent to the tow. Non-consent tows typically occur in emergency situations and when tows are made from private property.") (emphasis added). Consequently, we decline to adopt the restricted statutory construction advanced by plaintiffs.
 
 III Commerce Clause
 
 63
 Finally, the City declares that insofar as 49 U.S.C. § 14501(c) preempts its consensual tow rate regulations, it exceeds Congress' authority to regulate activities substantially affecting interstate commerce. See U.S. Const. art. I, § 8, cl. 3 (Commerce Clause); United States v. Lopez, 514 U.S. 549, 558-63, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (defining scope of commerce clause authority). The City concedes in its brief on this appeal that, in enacting the predecessor to § 14501(c), "Congress made the express finding that state regulation of intrastate motor carrier[s] substantially affects interstate commerce." See FAA Authorization Act, § 601(a), 108 Stat. at 1605 (congressional findings); H.R. Conf. Rep. No. 103-677, at 87-88, reprinted in 1994 U.S.C.C.A.N. at 1759-60 (same). But the City still insists that Congress failed to make the requisite findings specifically with respect to state regulation of intrastate towing, which it believes tends to be localized in its effects on commerce as compared with state regulation of intrastate motor carriers, the effect of which impacts a wider area.
 
 
 64
 In framing this argument, the City relies primarily on the Supreme Court's decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). There the Court held that the commerce clause power extends to regulation, first, of "the use of the channels of interstate commerce"; second, of "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and third, of "those activities that substantially affect interstate commerce." Id. at 558-59, 115 S.Ct. 1624. In determining whether a given activity "substantially affects" interstate commerce, the Court looked to the economic nature of the activity, its effects as viewed in the aggregate, other discernible ties to commerce, and congressional findings with respect to effects on commerce. See id. at 559-63, 115 S.Ct. 1624.
 
 
 65
 Lopez clarified that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." Id. at 562, 115 S.Ct. 1624. Rather, such findings play a key role only where "no ... substantial effect [is] visible to the naked eye." Id. at 563, 115 S.Ct. 1624. In the present case, the effects on interstate commerce are far from invisible. At least one affidavit submitted by plaintiffs, for instance, attests to the effects of the New York City towing laws on towing companies based in other states. See David Bender Aff. p 4 ("Because of our New Jersey geographic location, and our interstate operation, we frequently have to operate through New York City."). Given that many cities are situated in close proximity to nearby states, e.g., Chicago, Philadelphia, Kansas City, and Washington, D.C., it is reasonable to infer that municipal towing laws have, in the aggregate, a substantial effect on interstate commerce. We, of course, defer to the legislative will where any rational basis may be discerned for finding a substantial effect on interstate commerce from a given activity. See Preseault v. ICC, 494 U.S. 1, 17, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990); see also Lopez, 514 U.S. at 557, 115 S.Ct. 1624 (noting that rational basis standard applies); Proyect v. United States, 101 F.3d 11, 12-13 (2d Cir.1996) (per curiam) (same).
 
 
 66
 But even were this visible effect on commerce seen as something less than "substantial," see Lopez, 514 U.S. at 559, 115 S.Ct. 1624 (effect must be substantial), we think, as did the district court, that Congress' findings regarding state regulation of intrastate motor carriers provide a rational basis for preempting state regulation of intrastate towers as well. As the Supreme Court noted, " 'where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.' " 514 U.S. at 558, 115 S.Ct. 1624 (quoting Maryland v. Wirtz, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)) (emphasis removed). Since here the City similarly alleges that only a small subset of the activity encompassed by § 14501(c) has a de minimis effect on interstate commerce, Congress had a rational basis for regulating that subset within the context of its more general statutory scheme. See United States v. McKinney, 98 F.3d 974, 980 (7th Cir.1996) ("The same findings that authorize the federal government to regulate all commerce in controlled substances support its authority to regulate a subset of commerce in controlled substances," i.e., the selling of narcotics in school zones.), cert. denied, 520 U.S. 1110, 117 S.Ct. 1119, 137 L.Ed.2d 319 (1997).
 
 CONCLUSION
 
 67
 Accordingly, and for the reasons stated, we hold that 49 U.S.C. § 14501(c) does not preempt the New York City towing laws, except to the extent conceded by the City. We further hold that preemption of state and local regulation of intrastate towing under 49 U.S.C. § 14501(c) does not exceed Congress' authority to legislate pursuant to the Commerce Clause. The judgment of the district court is therefore affirmed.
 
 
 
 [1]
 Plaintiffs also challenge the district court's application of the rational basis standard of review in its analysis of the DARP and SARD programs. See Ace, 1997 WL 669891, at * 7 & n. 7. To the extent that the district court relied on our decision in Beatie v. City of New York, 123 F.3d 707 (2d Cir.1997), that decision addressed a Fourteenth Amendment question, not a preemption question, and therefore is inapposite. To the extent that the district court may have applied the Beatie standard without giving due consideration to Congress' purpose in enacting 49 U.S.C. § 14501(c), this application was erroneous. However, our agreement with the ultimate result of the district court's analysis renders it unnecessary to address this point further