Rev. Robert E. BAINES, David Riveria, Ramona Taylor, Felicita Roche, and Beverly A. Gray, each as Individuals, Electors and Residents of the City of Buffalo, Plaintiffs,

v.

Anthony M. MASIELLO, as Mayor of the City of Buffalo, in his Official Capacity, the City of Buffalo, a State Chartered Municipal Corporation, the Common Council of the City of Buffalo, a State Chartered Local Legislative Body, and Charles L. Michaux, III, as Clerk of the City of Buffalo, in his Official Capacity, Defendants.

No. 02–CV–0607C(HBS).

United States District Court, W.D. New York.

Oct. 6, 2003.

Venita A. Parker, Esq., Amherst, NY (Kenneth Nixon, of Counsel), Attorney for Plaintiffs.

City of Buffalo Department of Law (David R. Hayes, Esq., Assistant Corporation Counsel, of Counsel), Buffalo, NY, Attorney for Defendants.

CURTIN, District Judge.

Defendants move to dismiss the complaint pursuant to Rule 12(b)(6), or alternatively for summary judgment pursuant to Rule 56, of the Federal Rules of Civil Procedure (Item 76). Oral argument was heard by the court on September 5, 2003. For the following reasons, defendants' motion is granted.

## BACKGROUND

This action challenges the City of Buffalo's enactment in 2002 of Local Law No. 8, reducing the size of the City's Common Council from thirteen members to nine by eliminating three at-large seats and the position of Council President, and Local Law No. 13, revising the City's nine council districts to reflect the population numbers reported in the year 2000 federal decennial census. Plaintiffs Robert E. Baines, David Riveria, Ramona Taylor, and Felicita Roche are duly registered voters in the City of Buffalo, and plaintiff Beverly A. Gray is one of the three at-large council members whose seat was eliminated as a result of the challenged legislation. Defendants are the City of Buffalo, the Common Council, Mayor Anthony Masiello, and City Clerk Charles Michaux.

A brief discussion of the historical context of the current redistricting and downsizing dispute is in order. In 1980, the City of Buffalo had approximately 357,000 residents. The Common Council (as established by the 1927 City Charter) was comprised of nine-district members, five at-large members, and a separately elected Council President, for a total of fifteen members. In 1981, the City's Charter Revision Commission recommended reducing the number of district members from nine to eight, and at-large members from five to four, resulting in reduction of the total number of council members from fifteen to thirteen. This recommendation appeared as a proposition on the ballot in the November 1981 election, and was adopted by the voters (see Item 78, ¶¶ 4–5 & Ex. A).

In 1982, the Common Council considered numerous resolutions and proposed local laws to implement the downsizing approved by the voters, in accordance with New York Municipal Home Rule Law § 10.[1] On July 27, 1982, by a vote of nine

1. Section 10 of the New York Municipal Home Rule Law provides:

... In addition to powers granted in the constitution, the statute of local governments or in any other law, ... every local government, as provided in this chapter, shall have power to adopt and amend local laws not inconsistent with the provisions of the constitution or not inconsistent with any general law, relating to the following subjects, whether or not they relate to the property, affairs or government of such local government, except to the extent that the legislature shall restrict the adoption of such a local law relating to other than the property, affairs or government of such local government:

... In the case of a city, town or village, the membership and composition of its legislative body.
... The apportionment of its legislative body and, only in connection with such action taken pursuant to this subparagraph, the composition and membership of such body, the terms of office of members thereof, the units of local government or other areas from which representatives are to be chosen and the voting powers of individual members of such legislative body.
... As used in this subparagraph the term "population" shall mean residents, citizens, or registered voters. A population base for such a plan of apportionment shall utilize the latest statistical information obtainable from an official enumeration done at the

to six, the Council enacted a local law restoring the number of district members to nine, reducing the number of at-large seats from five to three, and retaining the Council President position. This local law was adopted by the voters in the November 1982 election, without legal challenge (*id.* at ¶¶ 6–7 & Ex. A).

In 1999, the composition of the Common Council was revisited by the City Charter Revision Commission. The Commission recommended that the current thirteen-member configuration be continued without change (*see id.* at ¶ 8 & Ex. C), but included in the proposed Charter a provision for the creation of a Citizens Advisory Commission on Reapportionment (the "Citizens Commission") to consider proposals and make recommendations for reconfiguration of the Common Council and the council districts "by the 30th day of July in the year following the decennial census"(*see id.* at Exs. D, H; *see also* Item 5, Ex. C, § 18–14). The voters adopted the new Charter, which became effective on July 1, 2000.

As reported in the May 4, 2001 edition of the *Buffalo News,* the reapportionment process contemplated by the new Charter was delayed to accommodate the City's challenge to the 2000 decennial census figures, which reflected an 11 percent decrease in population (to 292,648) during the 1990s (*see* Item 78, Ex. F). In January 2002, the City Clerk published a notice soliciting nominations for the Citizens Commission, which was finally chosen in March 2002. Numerous downsizing and redistricting proposals were submitted to the Citizens Commission and/or the Common Council during the early months of 2002 (*see id.* at Ex. G), and fact finding sessions and public hearings were conducted. As a result, on May 23, 2002 the

Citizens Commission presented its recommendation to the Common Council, proposing an eleven-member Council consisting of eight district members, two at-large members, and a Council President. The Council referred the recommendation to its Special Committee on Reapportionment (*id.* at ¶ 19).

A public hearing on reapportionment was conducted on July 22, 2002. The next day (July 23) the Common Council enacted Local Law No. 8, which called for a voter referendum on a proposal to amend the City Charter to eliminate the three at-large Council seats and the separately elected office of Council President, reducing the total number of council members from thirteen to nine. The vote on Local Law No. 8 was by simple majority, seven to six. As alleged in the complaint, the seven council members who voted for the enactment are White, and the six council members who voted against enactment are African–American (*see* Item 1, ¶ 61; Item 5, Ex. B). That same day the Council also passed, by the same vote, a resolution to retain the nine-district configuration, reapportioned to reflect the population changes reported in the 2000 census (referred to herein as the "Nine District Resolution") (*id.*). A further public hearing on reapportionment was conducted on August 15, 2002, and Mayor Masiello approved the Nine District Resolution on August 22, 2002.

Plaintiffs commenced this action on August 23, 2002 by service and filing of a summons and complaint seeking immediate injunctive and declaratory relief (a) to prevent the voter referendum on proposed Local Law No. 8, and (b) to implement a court-supervised reapportionment plan for the City (Item 1). The complaint named

same time for all residents, citizens, or registered voters of the local government....

N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(2), (13).

as defendants the City of Buffalo, the Common Council and its thirteen individual members, Mayor Masiello, and City Clerk Michaux, as well as the Erie County Board of Elections and Election Commissioners Laurence Adamczyk and Ralph Mohr. The complaint set forth three counts of violations of the federal Voting Rights Act (42 U.S.C. § 1973), two counts of violations of the criminal civil rights statutes (18 U.S.C. §§ 241 and 242), two counts of violations of the New York State Election Law, and four counts of violations of the City Charter and Code.

After making an initial finding that the plaintiffs had alleged sufficient facts on the face of the complaint for the court to assume subject matter jurisdiction over the action, the court took up plaintiffs' application for preliminary injunctive relief on an expedited basis. Upon meeting with counsel for the parties on September 16, 2002, and having considered the matters set forth in the pleadings, memoranda, affidavits, and exhibits filed by the parties, the court denied plaintiffs' application for preliminary injunctive relief but granted leave to file an amended complaint. Plaintiffs filed their first amended complaint on October 1, 2002 (Item 53), which eliminated the criminal civil rights claims but added claims for violation of the Equal Protection Clause (Counts I and II), the Due Process Clause (Count III), the Fifteenth Amendment (Count IV), 42 U.S.C. §§ 1981, 1983, 1985 and 1986 (Counts V, VI, X and XI), the New York State Constitution (Counts XII and XIII), and the New York State Municipal Home Rule Law (Count XIV). The amended complaint also eliminated the individual members of the Common

Council as defendants. Plaintiffs did not renew their request for preliminary injunctive relief.

In the meantime, on September 17, 2002, the Common Council adopted Local Law No. 10 to amend the City Charter to state the metes and bounds of the newly revised council districts. Mayor Masiello vetoed this measure due to errors in the metes and bounds (see Item 78, ¶ 29). On October 15, 2002, the Council enacted Local Law No. 13 with metes and bounds corrected to reflect the Nine District Resolution and accompanying map (id., ¶ 30).

On November 5, 2002, the City electorate approved the referendum on Local Law No. 8 eliminating the three at-large positions on the Common Council as well as the separately elected position of Council President, effective January 1, 2004. On November 6, 2002, Mayor Masiello signed Local Law Number 13 setting forth the reapportioned metes and bounds of the City's nine council districts.

On March 12, 2003, this court granted plaintiffs leave to file a second amended complaint, upon specific conditions. The second amended complaint contained the same twenty counts as the first amended complaint, and virtually the same factual allegations and demands for relief, with only minor changes to reflect the events subsequent to October 1, 2002 pertaining to the enactment of the nine-district reapportionment plan and voter approval of the downsizing referendum. The major change concerned the addition of at-large Council Member Beverly A. Gray, whose seat was eliminated as a result of the November 5 election, as a party plaintiff.[2]

---

2. On May 28, 2003, plaintiffs filed an application seeking the extraordinary relief of a declaratory judgment rendering Local Law No. null and void, or alternatively a preliminary injunction staying the implementation of local Laws Nos. 8 and 13, and staying the 2003

Common Council election, pending further order of the court (see Items 82 & 83). On May 30, 2003, the court denied the motion after hearing (Item 86). Plaintiffs' appeal from this ruling was likewise denied by the

Defendants now move to dismiss the claims against the Common Council, the Mayor, and the City Clerk on the grounds of legislative immunity and lack of capacity to be sued (*see* Item 77, pp. 5–9). Defendants also move to dismiss the claim against the City for failure to state a claim upon which relief can be granted, or in the alternative for summary judgment, on the ground that there are no genuine issues of fact for trial as to the appropriateness of the legislative procedures by which the size and composition of the Common Council were changed, and the council districts were reapportioned, and that defendants are therefore entitled to judgment as a matter of law on plaintiffs' federal claims brought under the Voting Rights Act, the Civil Rights Act, and the Equal Protection and Due Process Clauses of the Constitution (*id.* at 10–25).

## DISCUSSION

### I. Motion to Dismiss

The standards for district court review of a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted are well known. The court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y.1988), *quoted in Brennan v. Straub*, 246 F.Supp.2d 360, 363–64 (S.D.N.Y.2003). The complaint may only be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Con-*

*ley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).

Defendants contend that the complaint is subject to dismissal under Rule 12(b)(6) because the Common Council, the Mayor, and the City Clerk are absolutely immune from suit under the doctrine of legislative immunity, and because the Common Council lacks the capacity to be sued. These contentions are now addressed in turn.

### A. Legislative Immunity

It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative actions. *Bogan v. Scott–Harris*, 523 U.S. 44, 46, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998); *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). This protection extends as well to local officials acting in legislative capacities, *Bogan*, 523 U.S. at 46, 118 S.Ct. 966; *see also Carlos v. Santos*, 123 F.3d 61, 66 (2d Cir.1997), and applies equally to claims for declaratory relief, injunctive relief, and damages. *See Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 732–33, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980).

However, it is equally well established that legislative immunity only protects municipal officers from civil liability when they are sued in their personal capacities, and not when sued in their official capacities. *See Board of Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 677 n. *, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) ("[B]ecause only claims against the Board members in their *official* capacities are before us, and because immunity from suit under § 1983 extends to public servants only in their *individual*

384

capacities, the legislative immunity claim is moot.") (citation omitted); *see also Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 73 (2d Cir.1992) (town councilmen not entitled to legislative immunity in suit brought against them in their official capacities); *Legal Aid Society v. City of New York*, 114 F.Supp.2d 204, 231 (S.D.N.Y. 2000) (rejecting city's legislative immunity defense in official capacity suit brought against individual city officials). Because this suit is brought against Mayor Masiello and City Clerk Michaux in their official capacities only, those individual defendants are not entitled to immunity for their legislative actions.

■ It follows that, because legislative immunity is a personal defense, it cannot be asserted by a municipal entity or its legislative body. *See Kentucky v. Graham*, 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Goldberg*, 973 F.2d at 73–74 (2d Cir.1992). As stated in *Berkley v. Common Council of the City of Charleston*, 63 F.3d 295 (4th Cir.1995), *cert. denied*, 516 U.S. 1073, 116 S.Ct. 775, 133 L.Ed.2d 727 (1996):

> While there is indeed a long tradition of granting individual legislators at all levels of government a broad immunity from suits based upon their legitimate legislative activities, and though there are undoubtedly strong public policy justifications for such immunity, the Supreme Court has instructed that the defenses available to an official in a personal capacity action simply "are unavailable" in a suit against a governmental entity.

Id. at 300–01 (quoting *Graham*, 473 U.S. at 167, 105 S.Ct. 3099; footnotes omitted).

Accordingly, the Common Council, the Mayor, and the City Clerk are not entitled to legislative immunity.

**B. Capacity to be Sued**

■ Defendants also move to dismiss the complaint against the Common Council based on lack of capacity to be sued. The law of the state in which the district court sits governs the capacity of a governmental entity to sue or to be sued. Fed. R.Civ.P. 17(b); *Latino Political Action Committee v. City of Boston*, 581 F.Supp. 478, 484 (D.Mass.1984). In New York, a suit against a municipal legislative body is considered the functional equivalent of the suit against the municipality itself, since a plaintiff who prevails must look to the government entity as the real party in interest. *Kaczmarek v. Conroy*, 218 A.D.2d 97, 101, 635 N.Y.S.2d 310, 312 (3rd Dep't 1995); *see also Rini v. Zwirn*, 886 F.Supp. 270, 281 (E.D.N.Y.1995). Thus, courts routinely dismiss official capacity claims against a legislative body as redundant or duplicative of claims against the municipality itself. *See, e.g., Orange v. County of Suffolk*, 830 F.Supp. 701, 706–07 (E.D.N.Y.1993).

■ In addition, as noted by the district court in *Orange v. County of Suffolk*, a suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the entity of which the officer is an agent. *Id.* (citing *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Kentucky v. Graham*, 473 U.S. at 166, 105 S.Ct. 3099). Therefore, as with the Common Council, it would be redundant to allow the suit to proceed against the City of Buffalo and the individual city officials in their official capacities. *See LaCorte v. Hudacs*, 1996 WL 590735, at *4–5 (N.D.N.Y. October 8, 1996) (dismissing official capacity claims against county officials as redundant of claim against county); *Kohn v. Mucia*, 776 F.Supp. 348 (N.D.Ill.1991) (dismissing suits against defendants sued in their official capacity because the city was a named

defendant); *cf. Busby v. City of Orlando,* 931 F.2d 764 (11th Cir.1991) (affirming directed verdict in favor of city officials where the city remained a defendant).

Upon review of the complaint under these standards, it is clear that the Common Council is the legislative arm of the City without the capacity to be sued for the official legislative actions taken by its members. It is also clear that the action is brought against Mayor Masiello and City Clerk Michaux in their official capacities as employees or agents of the City of Buffalo, and is therefore functionally equivalent to a suit against the City as the real party in interest. Accordingly, plaintiffs can plead no set of facts to support a claim against the Common Council, Mayor Masiello, or City Clerk Michaux, and defendants' motion pursuant to Rule 12(b)(6) is granted dismissing plaintiffs' claims against those defendants as duplicative of the claims against the City itself.

## II. Summary Judgment

Defendants also move pursuant to Rule 56 for summary judgment dismissing the claims against the City. Under this Rule, summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *quoted in Morales v. Quintel Entertainment, Inc.,* 249 F.3d 115, 121 (2d Cir.2001).

Under the rule, the burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). To meet this burden, the party "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 ..., that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *Gateway Equipment Corp. v. United States,* 247 F.Supp.2d 299, 305–06 (W.D.N.Y.2003) (object of summary judgment is to discover whether one side has real support for its version of facts).

Defendants move for summary judgment in this case on the ground that there are no genuine issues of fact for trial as to the appropriateness of the legislative procedures by which the size and composition of the Common Council were changed, and the council districts were reapportioned. Defendants contend that they are entitled to judgment as a matter of law dismissing plaintiffs' federal claims brought under the Equal Protection and Due Process Clauses of the Constitution, the Voting Rights Act, and the Civil Rights Act, and that the court should decline to exercise supplemental jurisdiction over the remaining State law claims. These contentions are now addressed in turn, essentially in the order in which the claims appear in the pleadings.

## A. Counts I, II and IV—Equal Protection and Vote Dilution

In Counts I and II of the Second Amended Complaint, plaintiffs allege that the adoption of Local Laws Nos. 8 and 13 has created malapportioned and racially diluted districts, in violation of the Fourteenth Amendment's Equal Protection Clause.[3] More specifically, plaintiffs allege in Count I that the redrawing of council districts under the Nine District Resolution has resulted in a 13 percent deviation between the largest and smallest district populations, exceeding the 10 percent benchmark for permissible deviation from the requirement that all voting districts be of equal population. In Counts II and IV, plaintiffs allege that the downsizing of the Common Council and redrawing of district lines have resulted in the intentional division and dilution of the voting strengths of the African–American and Hispanic communities, in violation of the Fourteenth and Fifteenth Amendments.

The Supreme Court has long held that the "one-person, one-vote" requirement of the Equal Protection Clause necessitates periodic reapportionment of a state or local government's legislative election districts in order to maintain relatively equal voting populations. *See generally Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also Kimble v. County of Niagara*, 826 F.Supp. 664, 669 (W.D.N.Y.1993). This requirement prevents the governing entity "from diluting an individual's rights to vote and to receive equal representation, which can occur when one is placed in a heavily populated legislative district relative to other ... districts." *Fund for Accurate & Informed Representation v. Weprin*, 796 F.Supp. 662, 668 (N.D.N.Y.), *aff'd*, 506 U.S. 1017, 113 S.Ct. 650, 121 L.Ed.2d 577 (1992).

Although equal protection requires "an honest and good faith effort to construct districts ... as nearly of equal population as is practicable ...," *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), important public policy concerns may justify "minor deviations from mathematical equality ...." *Gaffney v. Cummings*, 412 U.S. 735, 745, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *see also Chapman v. Meier*, 420 U.S. 1, 24, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). Generally, redistricting plans with a maximum population deviation under 10 percent are deemed to fall within the "minor deviation" category, and insufficient to create a *prima facie* case of intentional discrimination under the Fourteenth Amendment. *See Brown v. Thomson*, 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *Kimble*, 826 F.Supp. at 669–70. Indeed, "slightly greater percentage deviations may be tolerable for local government apportionment schemes" than for congressional or state legislative districts, in recognition of the need to maintain the integrity of political subdivisions, provide for compact districts of contiguous territory, or other legitimate objectives. *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); *see also Brown*, 462 U.S. at 842, 103 S.Ct. 2690; *Montano v. Suffolk County Legislature*, 268 F.Supp.2d 243, 267 (E.D.N.Y.2003).

In this case, defendants have submitted the affidavit of David DiSalvo, Coordinator of Planning Analysis for the City of Buffalo's Office of Strategic Planning, which establishes that the City's redrawing of the nine council districts based on the 2000 census resulted in an 8.8%

---

**3.** Similar claims are raised in Count XII under the New York State Constitution, and in Count XIV under the New York Municipal Home Rule Law.

deviation from the largest district population (Niagara—33,962) to the smallest (Ellicott—31,077) (Item 97, ¶¶ 7–10). This deviation, determined in accordance with the Supreme Court's standards for measuring the difference in effective voting power between the most underrepresented voter and the most overrepresented voter, *see Abate,* 403 U.S. at 184, 91 S.Ct. 1904, undeniably qualifies as "minor" and insufficient to create a *prima facie* case of invidious discrimination under the Fourteenth Amendment. Plaintiffs have not come forward with any proof by way of affidavits, exhibits, or otherwise to dispute these figures, or to provide factual support for their allegation that the reapportionment has resulted in a 13 percent deviation between the largest and smallest district populations. In the absence of such proof, plaintiffs have failed to meet their burden on this motion to show that there is a genuine issue for trial of their claim that the City's redrawing of the nine council districts violated the Equal Protection Clause.

 With respect to plaintiffs' Fifteenth Amendment claim, it is uncertain whether the Fifteenth Amendment even applies to vote dilution. *See Voinovich v. Quilter,* 507 U.S. 146, 159, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims . . . ."). Indeed, the Supreme Court has stated that "we never have held any legislative apportionment inconsistent with the Fifteenth Amendment." *Id.; see also Montano,* 268 F.Supp.2d at 270 (E.D.N.Y.2003); *Parker v. Ohio,* 263 F.Supp.2d 1100, 1106 (S.D.Ohio 2003). Rather, as a general matter, the Fifteenth Amendment applies to claims based on a denial of the right to

vote. *See Baker v. Pataki,* 85 F.3d 919, 926 (2d Cir.1996). No such claim has been advanced here. In any event, those courts that have considered a claim of vote dilution under the Fifteenth Amendment have "subsume[d] ... determination of this claim in the analysis required under the Fourteenth Amendment." *Reed v. Town of Babylon,* 914 F.Supp. 843, 891 (E.D.N.Y.1996) (citing cases). Having failed to establish a *prima facie* case of intentional discrimination under the Fourteenth Amendment, plaintiffs' Fifteenth Amendment claim fails as well.

Accordingly, defendants' motion for summary judgment is granted dismissing Counts I, II and IV of the Second Amended Complaint as a matter of law.

## B. Count III—Due Process

Plaintiffs allege in Count III that Local Laws Nos. 8 and 13 were adopted in violation of state and local procedures, resulting in a denial of due process guaranteed under the Due Process Clause of the Fourteenth Amendment.[4] Although not explicitly pleaded, plaintiffs contend that this claim invokes both procedural and substantive due process protections.

 To the extent Count III states a claim for violation of plaintiffs' rights to procedural due process, that claim must be dismissed. The fundamental requirement of procedural due process is "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (internal quotation omitted); *see Holcomb v. Lykens,* 337 F.3d 217, 223 (2d Cir.2003). However, official action

---

4. Plaintiffs also cite 42 U.S.C. § 1343 as a basis for their due process claim in Count III. There is no such statute. Assuming plaintiffs meant to cite 28 U.S.C. § 1343, that section creates no separate rights, but instead confers federal court jurisdiction for enforcement of rights arising under the Constitution or federal law. *See Howard v. State Department of Highways of Colorado,* 478 F.2d 581, 585 (10th Cir.1973).

that is legislative in nature is not subject to the notice and hearing requirements of the due process clause. *Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 142 (2d Cir.1994). These constitutional requirements apply only where the official action is "designed to adjudicate disputed facts in particular cases." *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

■ It is beyond dispute that the City's enactment of Local Laws Nos. 8 and 13 was official action designed for general application to the city population as a whole, rather than directed at the adjudication of a particular factual dispute. As such, the conduct complained of was clearly "legislative in nature" and beyond the scope of the procedural component of the Fourteenth Amendment's Due Process Clause.

■ Plaintiffs' substantive due process claim also fails as a matter of law. The cases recognize a substantive component of the Due Process Clause that protects individual liberty against abusive government action, "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). However, the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). The due process clause "is not a guarantee against incorrect or ill-advised [government] decisions." *Bishop v. Wood,* 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

■ A substantive due process claim based on allegedly abusive conduct by government officials therefore ordinarily requires evidence of conduct that "can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *Collins,* 503 U.S. at 128, 112 S.Ct. 1061; *see also Rosa R. v. Connelly,* 889 F.2d 435, 439 (2d Cir.1989) (requiring evidence that official action was "arbitrary or irrational or motivated by bad faith"), *cert. denied,* 496 U.S. 941, 110 S.Ct. 3225, 110 L.Ed.2d 671 (1990). But where the government action complained of is legislative in nature, the plaintiff's substantive due process claim is subject to an even more stringent test: legislative acts are presumed valid and must be upheld if "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Beatie v. City of New York,* 123 F.3d 707, 711 (2d Cir.1997). Under this test, the court will invalidate legislative action on substantive due process grounds "only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose." *Beatie,* 123 F.3d at 711 (citing *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976)).

■ Plaintiffs cannot make this showing in this case. As discussed above, Section 10 of the New York Municipal Home Rule Law authorizes the City to adopt local laws "not inconsistent with the provisions of the constitution" relating to the membership, composition, and apportionment of its legislative body. N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(2), (13); *see* note 1, *supra; see also* Buffalo City Charter §§ 18–10 through 18–18 (setting forth procedures for reapportionment and redefinition of council districts). This is precisely what Local Laws Nos. 8 and 13 were designed to do. In the absence of any evidence of arbitrary or irrational conduct or bad faith motivation on the part of defendants, beyond the conclusory and un-

supported allegations contained in the Second Amended Complaint, this court must presume those enactments to be rationally related to the legitimate governmental objectives of defining the size and makeup of the Common Council and apportioning its elective districts to account for changes in the City's population as reflected in the decennial census.

Accordingly, defendants' motion for summary judgment is granted dismissing Count III of the Second Amended Complaint as a matter of law.

### C. Counts V and VI—42 U.S.C. §§ 1981 and 1983

In Counts V and VI, plaintiffs allege that the downsizing and redistricting plans were adopted in violation of 42 U.S.C. §§ 1981 and 1983. Section 1981 provides that, "[a]ll persons ... shall have the same right ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ...." 42 U.S.C. § 1981. To prevail under this statute, a plaintiff must plead and prove the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Mian v. Donaldson, Lufkin & Jenrette Securities,* 7 F.3d 1085, 1087 (2d Cir.1993), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). Equal protection under the laws is one of the enumerated activities. *Cf. Patterson v. County of Oneida,* 2002 WL 31677033, at *3 (N.D.N.Y. October 30, 2002).

As discussed above, plaintiffs have failed to establish even a *prima facie* case that the downsizing and redistricting plans resulted in the intentional denial of equal protection of the laws under the Four-teenth or Fifteenth Amendments. Accordingly, plaintiffs' § 1981 equal protection claim fails as well.

Likewise, by definition Section 1983 does not create any substantive rights; rather, it merely provides a remedy for deprivations of federal constitutional or statutory rights. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). As discussed elsewhere in this decision and order, because plaintiffs have failed to establish that the downsizing and redistricting plans resulted in any such deprivations, their Section 1983 claim must also be dismissed.

Accordingly, defendants' motion for summary judgment is granted dismissing Counts V and VI of the Second Amended Complaint as a matter of law.

### D. Counts VII, VIII, and IX—The Voting Rights Act

The primary focus of plaintiffs' federal claims in this case is Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, which provides:

(a) No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ... as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of

this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(a), (b). Plaintiffs allege that the City's adoption of the downsizing and reapportionment plans has resulted in unlawful dilution of the voting strength of African–American and Hispanic citizens, in violation of Section 2.

■■■■ The Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), set forth mandatory prerequisites which must be established by a plaintiff in a claim of unlawful dilution of minority voting strength, or "vote dilution," under this section. Specifically, the Court held that in order to make a successful Section 2 vote dilution claim, the plaintiff must establish that (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the minority group is politically cohesive, and (3) the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances (such as the minority candidate running unopposed) usually to defeat the minority's preferred candidate. *Id.,* 478 U.S. at 50–51, 106 S.Ct. 2752; *see National Association for the Advancement of Colored People, Inc. v. City of Niagara Falls,* 65 F.3d 1002, 1007 (2d Cir.1995). Even if these factors are satisfied, the court must consider whether, under the totality of the circumstances, the challenged standard, practice or procedure "impair[s] the ability of ... [minority] voters to participate equally in the political process and to elect candidates of their choice." *Gingles,* 478 U.S. at 80, 106 S.Ct. 2752.[5]

In addition to determining whether the *Gingles* preconditions are met and whether the totality of the circumstances sup-

---

[5]. *Gingles* discussed several factors relevant to this inquiry, set forth in a 1982 Senate Judiciary Committee Report and paraphrased here as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction;
8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*See Gingles,* 478 U.S. at 36–37, 106 S.Ct. 2752 (citing S.Rep. at 28–29, 1982 U.S.C.C.A.N. 206–07).

ports a finding of unequal access to the political process, the court "must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice." *Holder v. Hall,* 512 U.S. 874, 880, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994). As explained by the Supreme Court:

> [T]he phrase [vote dilution] itself suggests a norm with respect to which the fact of dilution may be ascertained.... [I]n order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it "should" be for minority voters to elect their preferred candidates under an acceptable system.

*Gingles,* 478 U.S. at 88, 106 S.Ct. 2752 (O'Connor, J., concurring in part and concurring in judgment), (internal quotes omitted), *quoted in Holder,* 512 U.S. at 880, 114 S.Ct. 2581.

In *Holder,* the Supreme Court rejected a Section 2 vote dilution claim brought by African–American voters challenging Bleckley County, Georgia's form of government under which a single commissioner performed all of the executive and legislative functions of the county government. The Court found that choosing a hypothetical larger or smaller governing authority as an objectively reasonable alternative practice for dilution comparison was "extremely problematic"—indeed, "inherently standardless," because of the wide range of possibilities as to the acceptable size of a governing authority. *Holder,* 512 U.S. at 889, 114 S.Ct. 2581 (O'Connor, J., concurring in part and concurring in judgment). The Court "therefore conclude[d] that a plaintiff cannot maintain a § 2 challenge to the size of a government body, such as the Bleckley County Commission." *Id.* at 885, 114 S.Ct. 2581.

■ Plaintiffs have failed to provide any reasons why the rationale of *Holder* should not apply in this case as a bar to the Section 2 challenge to the City's downsizing proposal. First of all, there is simply no basis for the argument that the pre-downsizing racial composition of the Common Council (46 percent African–American, including the occupants of the Council President and two at-large positions) can in any way be used as a valid predictor of the racial composition of future Councils. As demonstrated by the statistics provided by defendants, the minority composition of the Council since 1983, when the number of at-large seats was reduced from five to three, has ranged from 38 percent (five of thirteen) to 56 percent (seven of thirteen) (*see* Item 78, ¶¶ 62–69 & Ex. B). In addition, three different legislatively authorized bodies—the Charter Revision Commission, the Citizens Commission, and the Common Council itself—have thoroughly considered the size and composition of the Common Council, with each body making a different recommendation. Absent any showing of an ideal size and composition for the legislature of the City of Buffalo, or a basis for finding one size more reasonable than another, this court must follow the precedent of *Holder* and reject plaintiffs' Section 2 claim for failure to establish a reasonable alternative practice as a benchmark against which the court might measure Local Laws Nos. 8 and 13 to decide whether the nine-district council plan adopted by the City electorate has made it harder for minority voters to elect the candidates they prefer.

■ Furthermore, the court must "accord[ ] great deference" to a municipal legislature's duly enacted choices as to its size and composition. *Hines v. Mayor and Town Council of Ahoskie,* 998 F.2d 1266, 1271 (4th Cir.1993); *see also Sixty–Seventh Minnesota State Senate v. Beens,* 406

**392**

U.S. 187, 200, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1972) ("Size is for the state to determine in the exercise of its wisdom and in the light of its awareness of the needs and desires of its people."). Only when the evidence suggests that the legislature has chosen its size "solely in order to diffuse [minority] voting strength" should a federal court not allow deference. *McNeil v. Springfield Park District,* 851 F.2d 937, 946 (7th Cir.1988) (citing *Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1551 (11th Cir.), *cert. denied sub nom. Duncan v. Carrollton,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988)), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). Plaintiffs have failed to come forward with any evidence tending to show or suggest that elimination of the at-large and Council President positions through the duly enacted legislative and referendum process has in some way diluted African American voting strength, or affected the opportunity of African Americans "to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

The lack of a benchmark is not the only problematic aspect of plaintiffs' Voting Rights Act claims. Even if plaintiffs could point to sufficient proof in the record to provide a reasonable alternative practice against which to measure the nine-district council plan, their vote dilution claims would still fail. This is because under *Gingles* and its progeny, a Section 2 vote dilution claim cannot be maintained if the minority community at issue is proportionately represented, notwithstanding the presence or absence of any other precondition factor. *See Gingles,* 478 U.S. at 77, 106 S.Ct. 2752 (persistent proportional representation is inconsistent with allega-

tion that ability of black voters to elect representatives of their choice is not equal to that enjoyed by white majority); *see also Overton v. City of Austin,* 871 F.2d 529, 538 n. 10 (5th Cir.1989) (consistent minority electoral success is presumptively inconsistent with a Section 2 vote dilution claim). As discussed above, from 1983 to the present, minorities constituted from 38 percent to 54 percent of the thirteen-member City of Buffalo Common Council.[6] Assuming reelection of the current nine-district council members (all of whom are running for reelection in November 2003; *see* Item 78, Ex. J), African–Americans would hold 33 percent of the Council positions. This proof of consistent minority representation is "presumptively inconsistent" with plaintiffs' vote dilution claim, *Overton,* 871 F.2d at 538 n. 10, and in the absence of any countervailing evidence, precludes a showing by plaintiffs that, under the totality of the circumstances, the nine-district plan proposed by the Common Council, adopted by the voters, and enacted as law could "impair the ability of . . . [minority] voters to participate equally in the political process and to elect candidates of their choice." *Gingles,* 478 U.S. at 80, 106 S.Ct. 2752.

Finally, it must be reiterated that Section 2 of the Voting Rights Act does not provide the right "to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). Rather, Section 2 proscribes any electoral scheme in which minorities have "less opportunity than other members of the electorate" to elect representatives of their choice. *Id.; see also Hines,* 998 F.2d at 1274. Thus, the purpose of Section 2 is to ensure that minorities have an "equal opportunity to partici-

---

**6.** According to year 2000 decennial census figures, African Americans constitute 37.2 percent of the City's population, and repre-

sent a racial majority in four districts (Masten, 88%; Ellicott, 62%; University, 60%; and Fillmore, 50%) (*see* Item 96, Exs. L. M).

pate in the political processes and to elect candidates of their choice." *Gingles,* 478 U.S. at 44, 106 S.Ct. 2752. Under these principles, the challenged electoral scheme "must not operate to cancel out the voting strength of racial elements of the voting population." *Hines,* 998 F.2d at 1274 (citing *League of United Latin American Citizens Council No. 4434 v. Clements,* 914 F.2d 620, 627 (5th Cir.1990), *rev'd on other grounds sub nom. Houston Lawyers' Assoc. v. Att'y General of Texas,* 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991)). "In other words, 'while a vote must have equal weight, it is not, even if cast by a member of the protected class, entitled to have greater weight than any other vote.'" *Hines,* 998 F.2d at 1274 (quoting *Smith v. Brunswick County, Va. Bd. of Supervisors,* 984 F.2d 1393, 1398 (4th Cir.1993)). The legislative body may not devise a districting plan solely for the purpose of segregating citizens into separate voting districts on the basis of race, without sufficient justification. *Shaw v. Reno,* 509 U.S. 630, 658, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

Under these standards, plaintiffs cannot succeed on their claims that the enactment of Local Law No. 8 resulting in the elimination of the at-large and Council President positions, and Local Law No. 13 resulting in reapportionment of the existing nine council districts, violated Section 2 of the Voting Rights Act. Simply stated, there is no support in the record-including the extensive submissions made in conjunction with the expedited hearing on plaintiffs' original request for preliminary injunctive relief-for a finding by a trier of fact that the downsizing and redistricting plans have in any way lessened the opportunity of African American voters to participate in the electoral process or to elect representatives of their choice. To the contrary, the undisputed proof in the record establishes that African–Americans consti-

tute a racial majority in four of the nine council districts, as redesignated by Local Law No. 13 (*see* Item 96, Exs. L, M and note 5, *infra*). The logical inference to be drawn from this proof is that elimination of the at-large and Council President positions, which were elected on a city-wide basis, has actually enhanced the opportunity for African–American representation on the Common Council, as compared to other members of the electorate. Significantly, no cases have been cited, and none have been found, to support the proposition advanced by plaintiffs in this case that converting from a mixed at-large and single-district legislative system to an all-district system gives rise to a claim of vote dilution under Section 2 merely because, at the time of conversion, the at-large positions were held by members of a racial minority.

Plaintiffs' citation to the recent Supreme Court case of *Georgia v. Ashcroft,* 539 U.S. ——, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003), is to no avail. That case involved an action by the State of Georgia seeking judicial preclearance of its legislative redistricting plan under Section 5 of the Voting Rights Act. As noted by the Supreme Court, Section 5 is limited both in its substantive goal ("to insure that no voting procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise") and in its coverage (to particular jurisdictions listed at 28 C.F.R. § 51.4, App. A). *Id.,* 539 U.S. at ——, 123 S.Ct. at 2510. Buffalo is not a covered jurisdiction, and is not subject to the Section 5 requirement that it seek judicial or administrative preclearance of legislative changes to its voting standards, practices, or procedures. *See* 42 U.S.C. § 1973c. Furthermore, while some parts of the Section 2 vote dilution analysis may overlap with the Section 5 preclearance inquiry,

the two sections "differ in structure, purpose, and application." *Holder,* 512 U.S. at 883, 114 S.Ct. 2581, *quoted in Georgia v. Ashcroft,* 539 U.S. at ——, 123 S.Ct. at 2510. Accordingly, the *Georgia v. Ashcroft* case provides little, if any, support for plaintiffs' claims in this case.

Based on this analysis, the court must conclude that plaintiffs have failed to meet their burden on this motion to show that there is a genuine issue for trial of their claim that the City's adoption of Local Laws No. 8 and 13 resulted in vote dilution in violation of Section 2 of the Voting Rights Act. Therefore, defendants' motion for summary judgment is granted dismissing Counts VII, VIII and IX of the Second Amended Complaint as a matter of law.

## E. Counts X and XI—Civil Rights Conspiracy

Plaintiffs also allege that, in adopting the downsizing and reapportionment plans, the Common Council and the Mayor conspired to deprive plaintiffs of their constitutional and statutory rights, in violation of 42 U.S.C. §§ 1985 and 1986. Section 1985 provides a cause of action where "... two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ...." 42 U.S.C. § 1985(3). Section 1986 imposes liability on an individual who has knowledge of wrongs prohibited under Section 1985, but fails to prevent them. *See Koch v. Mirza,* 869 F.Supp. 1031, 1039 (W.D.N.Y.1994).

Defendants contend that these claims are barred by the "intracorporate conspiracy" doctrine, which is premised on the concept that a corporation generally cannot conspire with its employees or agents because all are considered a single legal entity. *See Girard v. 94th St. & Fifth Ave.*

*Corp.,* 530 F.2d 66, 70–72 (2d Cir.), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Rini,* 886 F.Supp. at 291. The doctrine has been applied by several courts to bar Section 1985 claims where the conspiratorial conduct challenged is essentially a single act by a single governmental body acting exclusively through its own officers, each acting within the scope of his or her official capacity, "[r]egardless of the motive or intent" of the act. *Rini,* 886 F.Supp. at 292; *see also Salgado v. City of New York,* 2001 WL 290051, at *8–9 (S.D.N.Y. March 26, 2001) (no Section 1985 conspiracy where all defendants are officers, agents and employees of single corporate entity-*i.e.,* City of New York); *Turner v. Randolph County,* 912 F.Supp. 182, 186–187 (M.D.N.C. 1995) (dismissing Section 1985 claim under the intracorporate conspiracy doctrine where allegations involved only county employees); *Rabkin v. Dean,* 856 F.Supp. 543, 551–52 (N.D.Ca.1994) (city may not be held liable under Section 1985 for conspiring with city council members); *Allen v. City of Chicago,* 828 F.Supp. 543, 564 (N.D.Ill.1993) (no Section 1985 conspiracy because mayor, commissioner of personnel, and city aldermen are members of same municipal corporation-*i.e.,* City of Chicago).

There is no dispute in this case that the conduct complained of on the part of the Common Council, the Mayor, and the City Clerk was undertaken within the scope of official activity. Based on the rationale of the intracorporate immunity doctrine, plaintiffs' Section 1985 claim cannot be maintained since the acts alleged to be in furtherance of the conspiracy were performed solely within the scope of the alleged conspirators' duties as officials or employees of the City, a single municipal entity incapable of conspiring with itself. In the absence of a viable Section 1985

claim, there can be no violation of Section 1986. *Koch,* 869 F.Supp. at 1039.

Accordingly, defendants' motion for summary judgment is granted dismissing Counts X and XI of the Second Amended Complaint as a matter of law.

### F. State Law Claims

The remaining claims in the case (Counts XII through XX) raise various state and municipal law issues under the New York Constitution, the New York Municipal Home Rule Law, the New York Election Law, and the City of Buffalo Charter and Code. Defendants urge the court to decline to exercise supplemental jurisdiction over these claims.

 Under the supplemental jurisdiction statute, a district court may decline to exercise jurisdiction over remaining state law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Castellano v. Board of Trustees,* 937 F.2d 752, 758 (2d Cir.), *cert. denied,* 502 U.S. 941, 112 S.Ct. 378, 116 L.Ed.2d 329 (1991) (internal quotation omitted). This is particularly true "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought .…" *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However, the court retains the discretionary authority to hear the state claims upon balancing several factors, including whether the dismissal of the federal claim occurs "late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims," as well as broader considerations of judicial economy, conven-ience, fairness to the litigants, and comity. *Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994) (internal quotation omitted); *see also Castellano,* 937 F.2d at 758.

 Upon consideration of these factors in this case, the court declines to exercise supplemental jurisdiction over the remaining state law claims. First of all, it is clear that issues of state and local law substantially predominate in this action. As demonstrated by the positions presented at oral argument and throughout the course of prior proceedings, the plaintiffs' case primarily focuses on the contention that the reapportionment process was wrongfully delayed until 2002 (*i.e.,* when white council members had regained a 7–6 majority), in violation of the City Charter provisions requiring that the process commence "in the year following the decennial census" of 2000. In response, defendants advance several practical considerations for interpreting the Charter language to allow for commencement of the reapportionment process in 2002–the year following the release of the census results. For example, as alleged in the Second Amended Complaint, the United States Census Bureau did not release the 2000 census figures until March 14, 2001, and the City's Office of Strategic Planning did not release its analysis of the census data (reflecting population changes in the council districts) until May 2001 (Item 73, ¶¶ 23–24). As reported in the May 4, 2001 edition of the *Buffalo News,* the City planned to challenge this data, and the City's Law Department issued an opinion that the City Charter allowed the process to be delayed until January 2002 because the census figures had yet to be finalized. According to the *Buffalo News* article:

> [Council President] Pitts said that given the uncertainty over the final census figures, it makes sense to postpone reapportionment. He said precedents were

set after the 1980 and 1990 census counts, when final redistricting plans were not approved until a year after the new population figures were finalized.

"We've determined that in order to allow for a fair and reasonable public process, we should extend the timeline," Pitts said. "It's certainly better than trying to squeeze out a plan that would likely become very controversial."

(Item 78, Ex. F).

Plaintiffs also claim that the Council's vote on the downsizing proposal was invalid under Section 23–5 of the City Charter, which requires a two-thirds majority vote on a "permissive" referendum.[7] However, as pointed out by defendants, Section 23–2 of the Charter recognizes that New York's Municipal Home Rule Law controls in matters of permissive and mandatory referenda.[8] Under the Municipal Home Rule Law, a local law which changes the membership or composition of the legislative body of a city, town or village "shall be subject to mandatory referendum ...," N.Y. Mun. Home Rule Law § 23(2), and "at least the majority affirmative vote of the total voting power of the legislative body" is required for passage. N.Y. Mun. Home Rule Law § 20(1); *see also* City Charter § 3–17(a), (c) (proposed local law not certified by mayor for immediate passage shall be passed by majority affirmative vote of total voting power of common council); *cf.* 1998 N.Y. Op. Atty. Gen.

(Inf.) 1086, 1998 WL 643360 (N.Y.A.G.) (local government may not modify procedure for enactment of local laws by requiring that local laws be enacted by supermajority vote).[9]

In addition, the dismissal of the federal claims has occurred at an early stage of the litigation. Although the parties have already expended substantial resources in preparing and defending the applications for injunctive relief, there has been no taking of depositions or other expensive discovery. Finally, and significantly, all of the state law claims set forth in the Second Amended Complaint have been raised in a parallel action currently pending in New York State Supreme Court. *See Pitts v. City of Buffalo,* 298 A.D.2d 1003, 749 N.Y.S.2d 343 (4th Dep't 2002).

Under these circumstances, I find that considerations of judicial economy, convenience, fairness to the litigants, and comity owed to the state courts favor having the remaining factual and legal issues as to whether the City's enactment of Local Laws Nos. 8 and 13 comply with the relevant state and municipal laws determined in the state forum. *Cf. Valencia v. Lee,* 316 F.3d 299, 306 (2d Cir.2003) (finding district court's exercise of supplemental jurisdiction over state law claims after it had dismissed all federal claims was abuse of discretion, "especially where [state claims turn on] questions concern[ing] the

7. Section 23–5 of the City Charter provides:

 Except as otherwise provided by the local finance law, the council may by resolution adopted by two-thirds vote of its members, submit to the electors of the city for determination by them at a general or special election, any question or questions relating to a subject upon which the council has power to act.

8. Section 23–2 of the City Charter provides:

 Nothing in this article shall be deemed to limit the mandatory and permissive referen-

dums on local laws contained in the municipal home rule law.

9. This discussion is by no means intended to represent an exhaustive examination of the state law claims set forth in the complaint, or a definitive ruling on the issues raised by those claims. Rather, the discussion is included here only by way of illustrating the predominance of plaintiffs' state and local law claims for the purpose of determining whether to decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3).

397

state's interest in the administration of its government"); *Seabrook v. Jacobson,* 153 F.3d 70, 71–73 (2d Cir.1998) (declining supplemental jurisdiction over question of state law which "require[d] a balancing of numerous important policies of [local] government.").

Accordingly, having dismissed the claims over which it has original jurisdiction, the court declines to exercise supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the foregoing reasons, defendants' motion (Item 76) is granted in its entirety, and the case is dismissed. The Clerk of the Court is directed to enter judgment in favor of defendants.

So ordered.